**Delton HERMAN, Plaintiff, Appellee,**

v.

**GENERAL IRRIGATION CO., a fictitious named company of Carthage, Missouri, Defendant, Appellant,**

**and**

**Ford Motor Company, a corporation, Defendant, Appellee.**

**Civ. No. 9227.**

Supreme Court of North Dakota.

Nov. 30, 1976.

**474**

Pearce, Anderson, Pearce, Thames & Pearce, Bismarck, for defendant and appellant General Irrigation Co.; argued by Harry J. Pearce, Bismarck.

Sperry & Schultz, Bismarck, for plaintiff and appellee; argued by Floyd B. Sperry, Bismarck.

Conmy, Rosenberg & Lucas, Bismarck, for defendant and appellee Ford Motor Co.; argued by A. William Lucas, Bismarck.

SAND, Justice.

Plaintiff Delton Herman, a Mercer County farmer, brought an action against General Irrigation Company and Ford Motor Company when his irrigation system failed shortly after its purchase. Herman alleged a defect in the diesel 401 Ford engine which powered the system. General Irrigation had assembled the center-pivot irrigation system, incorporating as a component part the 401 diesel engine manufactured by Ford. Herman bought the system from James Cook, an independent dealer of General Irrigation products, but who was not joined as a party defendant. The Mercer County district court rendered judgment in favor of the plaintiff and against General Irrigation in the amount of $14,109.91; dismissed General Irrigation's cross-claim for indemnity against Ford, but held Ford liable to General Irrigation on warranty grounds for replacement or repair costs of the diesel engine. From that judgment defendant General Irrigation appeals.

A brief background will be helpful.

Prior to purchasing the irrigation system, Herman had his land soil-tested and examined for irrigation suitability. It was found to be well adapted to irrigation. Some of the 3,000 acres had been irrigated in the past. Herman entered into a purchase contract with James Cook, d. b. a. Cook Irrigation Company, for a center-pivot irrigation system similar to the one used by Cook himself at his Hazen, North Dakota, ranch. Cook ordered the system from General Irrigation Company, a sole proprietorship owned and operated by Rowland Diggs. General Irrigation added approximately 300 parts to the Ford engine, but without altering the basic engine unit itself. Application of those parts and use of the engine in the system was approved by Ford application engineers who examined a prototype unit identical to the one purchased by Mr. Herman.

The unit was shipped in a partially disassembled state from General Irrigation's plant in Missouri to Herman's ranch. Some extra pipe included in the original purchase contract was returned, so the actual cost of the system was $16,648.92, which Herman paid in cash. Cook worked with Herman and his hired man, Clarence Upsahl, in assembling the system. The three followed all operating procedures before starting the engine. The system ran for roughly one-half hour without problem, but then issued black smoke, became sizzling hot, and

locked up tight. A hose on the suction side of the water pump had become detached from the heat exchanger, evacuating the coolant from the engine. Cook and Herman waited until the engine cooled down, then reconnected the hose, replaced the coolant, and restarted the engine. It ran for forty-five minutes before stopping in a manner similar to the first failure. They checked the heat exchanger, the water pump, and the radiator, which were all found to be in good order. They then removed and examined the head in the field. Promptly thereafter, upon Ford's recommendation, the Ford engine was taken to Bis-Man Ford tractor dealership and examined, where the head was found to be warped and three cylinders badly scored. Ford refused to authorize a complete overhaul, in spite of the fact that the service manager at Bis-Man Ford, Ervin Mantz, said the engine would have to be dismantled and rebored and the pistons replaced in order to repair it. Ford authorized only replaning of the head and replacement of the head gasket. This was done, but Mantz refused to guarantee the engine out the door because of the severe internal damage that had been done to it.

The engine was returned to the Herman ranch where Cook and Herman again readied it for operation. The unit was activated and ran for about twelve hours before the pistons locked up and the engine stopped under circumstances paralleling those of the first two failures. The engine was hot and the same hose again had become disconnected from the heat exchanger. Exasperated with the engine and his inability to see it put in working order, Herman placed it in storage in a Quonset on his farm.

He then purchased an International V–8 engine at his own expense to replace the Ford engine, installing it into the original General Irrigation system with no change, except for the substitution of a radiator for the heat exchanger on the new engine. The heat exchanger used with the 401 Ford engine was taken to the General Irrigation plant, where it was tested and found to be in perfect working order, in spite of the fact that it was damaged in transit. Herman used the system for the following crop season. It has been functioning properly since then with no difficulties.

The trial court's findings of fact in part and in substance were: that Cook and Herman followed all operating procedures before starting the engine each time; that the engine was in excellent operating condition when it left the Ford plant; that the engine was tested at General Irrigation's plant where it passed all tests perfectly; that from the completion of successful testing until the engine was delivered to Herman it was under the control of General Irrigation; and that General Irrigation's claim for indemnity against Ford must be denied because the engine was not defective when put on the market by Ford.

Upon these findings, the trial court made its conclusions of law, that General Irrigation was liable to Herman in the amount of $14,109.91 on grounds of express or implied warranty and strict liability in tort for crop damages and losses, loss of time, telephone calls, trips, a replacement engine, and miscellaneous items of damages; that General Irrigation could not enforce its indemnity claim against Ford; that Ford was liable to General Irrigation only for repairs and replacement on warranty grounds; and that Herman should deliver the engine to Cook or General Irrigation so that the defendants could arrange for overhaul of the engine.

On appeal, General Irrigation argued that the conclusions of law are inconsistent with each other and with the findings of fact. More specifically, General Irrigation contends that dismissal of its cross-claim for indemnity against Ford constituted error, or in the alternative that imposition of liability on General Irrigation was error. General Irrigation asserted that from the evidence in the record, two alternatives were available to the trial court. Under one it could have concluded that evidence was sufficient to establish an internal defect in the Ford engine, in which case Herman would have been entitled to judgment against both Ford, as manufacturer, and General Irrigation, as intermediate seller.

Such a conclusion also would have entitled General Irrigation to indemnity against Ford. Under the other, the trial court could have found the evidence insufficient to establish a defect in the engine when it left Ford's control. Such a conclusion should have resulted in dismissal of the action against both defendants, in view of the fact that it was conceded at trial that General Irrigation had not modified the Ford engine unit itself in any way, nor damaged it, and that the only defect in the system alleged by any party was a defect in the engine. The trial court arrived at neither of these alternative conclusions. Rather, it found Ford liable on warranty grounds but only for the replacement or repair cost of the engine; it found no defect in the engine when it left Ford; it found General Irrigation liable for all damages and losses resulting from failure of the irrigation system; and it dismissed the indemnity claim by General Irrigation against Ford.

After having reviewed the record and the evidence in its entirety, we are convinced that a mistake has been made and therefore reverse in part the decision of the trial court.

■ The trial court erred in not finding Ford liable on strict liability grounds while at the same time imposing liability on Ford for breach of warranty for replacement cost of the engine. Liability based on either strict liability or breach of warranty cannot attach unless there is proof of a defect. 2 Frumer & Friedman Products Liability § 16.01[1], 16A[4][e]; *Johnson v. American Motors Corporation*, 225 N.W.2d 57 (N.D.1974). The imposition of liability without proof of a defect would in effect convert strict liability in tort into an absolute liability concept. While the strict liability concept relieves the plaintiff of the burden of proving negligence, it does not relieve him of showing a defect in the product. See *Engberg v. Ford Motor Company*, 205 N.W.2d 104 (S.D.1973). Likewise, if liability could be imposed under warranty theory without a showing that the product was defective, the supplier of the warranty

would in reality become an absolute guarantor of his product. The law has not gone so far.

■ Once it is established, however, that the product is defective under warranty theory, it becomes fairly clear that the product is also defective for purposes of strict liability in tort. There is no magic to the name given to the action. 2 Frumer & Friedman Products Liability § 16A[4]. Thus, if a product causes damage under circumstances constituting breach of warranty, it may be and probably is also legally defective under the strict liability theory even though there may be a variance in procedure.

The court, in *Farr v. Armstrong Rubber Company*, 288 Minn. 83, 179 N.W.2d 64, 69 (Minn.1970), observed that:

"Under the strict liability in tort doctrine, as in the case of express or implied warranty of fitness or merchantability * * * [i]f the article is defective, i. e., not reasonably fit for the ordinary purposes for which such articles are sold and used, and the defect arose out of the design or manufacture * * * and it proximately causes injury or damage to the ultimate purchaser or reasonably expected consumer, liability exists."

See also, *Santor v. A & M Karagheusian, Inc.*, 44 N.J. 52, 66, 207 A.2d 305 (1965).

In order to reach the legal conclusion that Ford be liable for breach of warranty, the trial court would have had to make a finding that the 401 Ford engine was defective when it left Ford.

Apparently the trial court improvidently placed undue emphasis on the warranty by only holding Ford liable for repair and replacement costs.

In pertinent part the Ford warranty provides:

"Ford Motor Company warrants to each authorized Ford industrial products distributor or original equipment manufacturer to whom it sells a new Ford industrial engine or power unit that each part of such engine or unit will be free under normal use and service from defects in

material and workmanship for a period of six months from the date of delivery to the original retail purchaser. Each authorized for industrial products distributor or original equipment manufacturer, acting on his behalf only, shall extend a similar warranty to his customer. Ford Motor Company obligation under this warranty is limited to free replacement of, including related labor (other than labor required to remove, replace or gain or close access to the engine or unit), by an authorized Ford industrial products distributor . . . ."

The trial court found the engine to be in excellent operating condition when it left the Ford plant. The trial court stated, in Finding of Fact XV:

"That General Irrigation had purchased a number of Ford 401 diesel engines to be used with this irrigation and equipment, manufactured and sold by it, had tested this engine to determine its fitness under similar conditions, which then appearing that the engine tested out from which it appeared to the Court that the engine had been found in excellent operating condition, when it left the Ford Motor Co. . . . ."

It appears from this that the trial court based its finding of no defect on the fact that testing had been conducted by General Irrigation showing the engine to be in good working order. A close examination of the record, however, reveals that the testing done at General Irrigation was of a type that would not necessarily have exposed the defect alleged here. General Irrigation's testing procedure was as follows: after each engine was installed in the irrigation unit and signed off by a final inspector, it was put on a test stand and run through a series of steps consisting of increased pressure and gallonage. Each system was hooked up to a pond for the testing, and water was pumped through a hose and nozzle similar to that used when the unit is activated in the field. During testing, notes were taken on temperature, pressure, and other conditions. Eventually, the engine was stepped up to full power and full load to find out the maximum pressure, and gallonage capabilities of the unit.

■■■ Two important points should be made about the testing procedure. First, the record shows that if no malfunction occurred, the entire testing procedure took approximately 25 minutes. The engine did not stop at the Delton Herman farm until it had been running under load for approximately 30 minutes. The remaining failures occurred after an even greater length of running time. Hence it is entirely likely that whatever the cause of the engine stoppage it would not have become apparent under this testing procedure. Second, it was conceded by General Irrigation that testing was not accomplished under actual field conditions. Although, in the words of Rowland Diggs, tests were conducted "as close to field conditions as we can get and still have a test facility," the system would have cost $3,000 more were it tested under circumstances identical to actual field use. Our analysis of the record regarding testing conditions leads us to conclude that the trial court's assumption of no engine defect was unjustified. It was an assumption based upon a testing procedure that cannot be considered complete, comprehensive, or conclusive. We are cognizant of the fact that it is the findings of fact, not the conclusions of law, to which the clearly erroneous rule applies. Eakman v. Robb, 237 N.W.2d 423 (N.D.1975); Estate of Elmer, 210 N.W.2d 815 (N.D.1973). Nevertheless, our examination of the record as to the testing procedure and a review of all the evidence in the record leaves us with a definite and firm conviction that a mistake was made by the trial court in its finding that no engine defect existed, and we conclude that such finding is clearly erroneous.

Other evidence in the record persuades us that a mistake was made by the trial court. Three out of four expert witnesses for the plaintiff concluded that oversized pistons were the cause of engine failure. Defendant's one expert witness did not rebut this testimony, he merely suggested another possible theory as to the cause of engine failure, a theory which was contradicted by

plaintiff's evidence. The defendants' expert speculated that when Cook and Herman assembled the irrigation unit they failed to tighten the hose clamp properly, and as a result the hose came off, the engine coolant was evacuated, and the engine overheated. Significantly, this witness could *not* explain why the same hose came off the second and third times the engine was started. Aside from the fact that there was conflicting evidence on this point, the trial court found that all operating procedures were followed before the unit was started each time. This implies that these procedures included checking all hose connections to see that they were properly tightened before the engine was started.

It should be mentioned, too, that the trial court found that when the engine was taken to Bis-Man Ford after the second failure, the cylinders were found to be scored. This finding is not inconsistent with testimony given by Ford's expert, who stated the scoring of the piston and cylinder walls would be the type of damage that would result from oversized pistons. All witnesses who actually observed Herman's engine were consistent in reporting scoring of the cylinder walls.

Thus we find that the clear weight of the evidence presented at trial showed a defect in the engine when it left Ford, namely, oversized pistons. Plaintiff Herman did carry the burden of proof on that issue, and his evidence was not substantially rebutted by the defendants.

We also attach some importance to the trial court's statement in its memorandum opinion that Herman be ordered to turn the engine over to General Irrigation or Cook Irrigation Company "so that defendants may arrange for an overhaul of the engine *which caused the system to fail.*" [Emphasis ours.] Although it does not appear in the findings, this statement would indicate that in the trial court's opinion failure of the *engine* caused failure of the system.

The uncontroverted fact was that the system did fail. No other defect was alleged in any other component part of the system except the Ford engine. Many of the components were tested at some time prior to trial and found to be in good working order. At the present time, the irrigation system is functioning well, the only change being substitution of a new engine without a heat exchanger for the Ford 401 diesel engine. Upon this evidence, we are convinced that a mistake has been made and we reverse the trial court's finding that the engine was not defective when it left Ford.

 We do not suggest that there was *conclusive* proof at trial of oversized pistons. To a certain extent, lack of conclusive evidence can be attributed to defendant Ford. Early in the trial, it became apparent that none of the parties had actually taken apart and examined the engine. The trial court, recognizing the desirability of such evidence, made the strong suggestion that the parties mutually select an expert to dismantle and inspect the engine in an effort to confirm or disprove the existence of an internal defect. Herman and General Irrigation were agreeable, but Ford resisted the court's suggestion, contending that restarting of the engine after the first failure had caused such extensive internal damage that the original problem could no longer be determined. To this date the engine has not been inspected. But conclusive proof is not necessary to show existence of a defect; it can be done by circumstantial evidence. *Langford v. Chrysler Motors Corp.*, 513 F.2d 1121 (2d Cir. 1975). It is not enough simply to show that an accident or mishap occurred to establish a defect, but the nature of the defect need not be precisely established, especially if a complex product is involved. A defect may be inferred from proof that the product did not perform as intended by the manufacturer. Hursh, American Law of Products Liability 1:11; *Lindsay v. McDonnell Douglas Aircraft Corp.*, 460 F.2d 631 (8th Cir. 1972). Expert testimony is of great value in establishing defectiveness, and here such testimony was presented. We believe such evidence was sufficient to establish that the engine was defective when it left the Ford plant, and that such defect was the cause of the system's failure

and consequent damage to plaintiff Herman.

This conclusion requires that we modify the remainder of the trial court's decision to conform to the finding of a defect. General Irrigation was found liable to Herman for $14,109.91, including crop damages and losses, loss of time, miscellaneous expenses, and a replacement engine. General Irrigation's cross-claim against Ford for indemnity was dismissed by the trial court. We hold that the dismissal was in error and that General Irrigation is entitled to indemnity against Ford in the full amount of damages assessed against it for the engine failure. It is the general rule that a retailer or other seller suffering and paying a judgment against him by an injured person in a warranty action is entitled to indemnity from a manufacturer who sold the product to him with a similar warranty. 3 Frumer & Friedman Products Liability 44.03[1]. And in the field of products liability, the concept underlying allowance of indemnity is that the indemnitee has been rendered liable because of a nondelegable duty arising out of common or statutory law, but the actual cause of the injury has been the act of another person. 3 Frumer & Friedman, *supra*, § 44.02[2]. See *Burbage v. Boiler Engineering and Supply Co.*, 433 Pa. 319, 249 A.2d 563 (1969).

It was conceded at trial that General Irrigation did not substantially change the basic engine unit, the only component part in which defect was alleged. Nor was any proof submitted that General Irrigation damaged or altered the system in any way. Ford admitted that its application engineers had approved the use of the diesel engine in the system in the manner in which General Irrigation incorporated it. The trial court's conclusion, rather than being based on the finding of a defect caused by General Irrigation, seems to have been based simply on the fact that General Irrigation had "control" of the product until it reached the Herman farm. In Finding of Fact XV, the court stated:

"That General Irrigation had purchased a number of Ford 401 diesel engines to be used with this irrigation and equipment, manufactured and sold by it, had tested this engine to determine its fitness under similar conditions, which then appearing that the engine tested out from which it appeared to the Court that the engine had been found in excellent operating condition, when it left the Ford Motor Co., the engine having been under the control of the General Irrigation Co., from the time of the test at the General Irrigation Co. plant, until delivered to the plaintiff and up until the time that it failed on the plaintiff's farm and ranch, it was under the control and direction of the General Irrigation Co., either through their transportation company or their dealer, James Cook of the Cook Irrigation Co."

Control over a product alone is not enough for imposition of liability. Our previous discussion covers the requirement that there be a showing of a defect, that the defect existed when it left the manufacturer or seller, and that the defect caused the injury or damage. In order for General Irrigation to be liable as an intermediate seller, it must have passed on such a defective product to Herman, in which case the manufacturer is liable as well. Thus, although we affirm the trial court's attachment of liability to General Irrigation, we do not agree that General Irrigation should be made to bear that liability alone.

Perhaps the trial court, in looking to the "control" element, was attempting to find General Irrigation solely liable under the doctrine of res ipsa loquitur. Although the product may have been in General Irrigation's control until it reached Herman, no inference of negligence can be made therefrom, because the record reveals that the engine was a sealed unit and was not altered in any appreciable way after it left the Ford plant.

The trial court concluded that the engine was defect-free when it left Ford, based upon the testing that was carried out at the General Irrigation plant, which showed the system to be working well. The record is weak as to whether this specific unit under-

went such tests, but even so, it was acknowledged that such tests were not conducted under actual field conditions. Further, the engine failed at the Herman farm only after it had been running "under a load" for some time, and the amount of time that elapsed between starting and seizure increased with each successive starting.

This court in *Sayler v. Holstrom*, 239 N.W.2d 276, 280 (N.D.1976), enumerated the situations in which joint tortfeasors might be allowed indemnity. Application of any of the following would entitle General Irrigation to indemnity:

"(1) Where the one seeking indemnity has only a derivative or vicarious liability for damage caused by the one sought to be charged.

. . . . .

"(3) Where the one seeking indemnity has incurred liability because of a breach of duty owed to him by the one sought to be charged.

"(4) Where the one seeking indemnity has incurred liability merely because of failure, even though negligent, to discover or prevent the misconduct of the one sought to be charged."

 Based on our finding that the 401 engine was defective when it left Ford, General Irrigation cannot be said to have been actively at fault, even if it failed to discover the engine defect. Ford, on the other hand, owed General Irrigation a duty to provide a product reasonably fit for its intended use. If, as the trial court found, General Irrigation was guilty of nothing more than "controlling" the product prior to delivery, it is entitled to recover against the manufacturer. It must be remembered that indemnity is an equitable doctrine not amenable to hard and fast rules. If a seller does no active wrong and does not alter the product before it is sold, he is entitled to indemnity. *Farr v. Armstrong Rubber Co., supra.* We think the equities here lie with General Irrigation, who passed on the engine in substantially its original form, rather than with Ford, who refused to have the engine examined and at the same time did little to controvert the evidence offered by the plaintiff.

In summary, we affirm the judgment against General Irrigation and against Ford on the breach of warranty claim, but hold that General Irrigation is entitled to indemnification in full against Ford Motor Co.; and we reverse the trial court's finding that the engine was defect-free when it left the Ford plant.

Affirmed in part and reversed in part.

ERICKSTAD, C. J., and VOGEL, PEDERSON and PAULSON, JJ., concur.