Esther GROSS, Personal Representative of the Estate of Reuben Gross, deceased, and Thomas Gross, Plaintiffs and Appellants,

v.

STA–RITE INDUSTRIES, INC., a corporation, Defendant and Appellee.

Civ. No. 10120.

Supreme Court of North Dakota.

July 30, 1982.

John C. Haugland and Evan F. Heustis, of Haugland & Heustis, Devils Lake, for plaintiffs and appellants.

James A. Reisnour, of Mackenzie, Jungroth, Mackenzie & Reisnour, Jamestown, for defendant and appellee.

VANDE WALLE, Justice.

The Grosses appealed from a judgment entered in the district court of Burleigh County in favor of Sta-Rite determining that liability was not established against Sta-Rite for an outbreak of mastitis in the Grosses' dairy herd. The Grosses sought damages from Sta-Rite for breach of warranties and negligent installation of an automatic milking machine. We affirm in part and remand for further proceedings.

Following preliminary negotiations and plans the milking system became operational in the early part of 1974. The new operation contained a "prep-parlor," a rotary table, and a milking system. The prep parlor sprayed a mist onto the cows' udders to cleanse them and otherwise prepare the cows before they step onto the rotary table for milking. The rotary table is a system where a cow steps onto a large circular platform, like a merry-go-round, and is milked as the platform rotates. By the time the cow nears the original boarding place the milking is done and the cow walks off the platform to the loafing area. Reflex arms hold the milking apparatus as the cow is being milked. When the cow has been milked, the reflex arms automatically release the apparatus from the cow and move the apparatus up and out of the way. The operator is stationed in a pit area in the center of the circular table where he attaches the milking system to the cows and otherwise controls the operation.

The milking system itself consists basically of teat cups which extract the milk into a cluster [1] which, by plastic or rubber tubes, is connected to a central container for the milk. The two components of a teat cup are the shell and the inflation. The inflation is a rubber or synthetic-rubber tube into which the teat is inserted. It is the only part that touches the cow and is designed to be a type of protection for the cow. The inflation is contained within a plastic or stainless steel shell with a space or chamber between them. To the shell is connected a small air hose from a pulsator, an air-vacuum-exchange device which intermittently creates a vacuum and admits air into the chamber between the inflation and the shell. When air is removed from the chamber a vacuum is created and the inflation opens. At this time the internal udder pressure of the cow is greater than the pressure outside the teat because of the opening of the inflation and this causes the milk to flow from the teat. This is called the milk stroke.

When the pulsator allows air to return to the chamber there is no vacuum to pull the inflation open so it collapses to its normal position around the teat, causing a massage of the udder which allows blood to flow back into the udder. This is called the rest, or massage stroke.

Too much vacuum at the end of a cow's teat can cause the sphincter muscle at the teat end to weaken and evaginate. When this happens the sphincter muscle falls and hangs down from the teat instead of closing as it should. As a result of evagination the sphincter no longer closes to protect the inside of the udder, and bacteria can easily enter and cause mastitis. It is this condition about which the Grosses complained.

Within the first seven to ten days after the Grosses started using their new milking system, problems started developing and eventually numerous cows became infected with mastitis. Arguments between the parties followed. As an increasing number of cows became infected the Grosses eventually returned to their old milking parlor.

The Grosses commenced a lawsuit against Sta-Rite, and other manufacturers and parties who were eventually dismissed, on the basis that the mastitis problem was a direct result of the milking system installed by Sta-Rite. The trial court determined that the Grosses essentially reduced their claim to the fact that excessive variation occurred in the vacuum level of the milking system, thereby causing mastitis. The trial court found, however, there was no evidence of any excess variation in the vacuum pressure of the milking system that would harm the cows. The court further stated in its findings that it was unable to determine the cause of the mastitis.

The trial court concluded that the Grosses had failed to establish liability on the part of Sta-Rite, whereupon this appeal was taken. The following issues involving challenges to the trial court's findings of fact are presented for our consideration:

1. For each cow there are four teat cups connected to a cluster. The cluster is also referred to as a claw or breaker cup.

1. Did the court err in finding that portions of the entire milking operation were installed by someone other than the defendant corporation without finding that the defendant corporation was responsible for the entire installation and the coordination of other components?

2. Did the court err in finding that the plaintiffs' expert relied upon another's tests and findings to reach the conclusion that the milking system caused the damage to the plaintiffs?

3. Did the court err in finding no evidence exists of any excess variation of the vacuum pressure in the milking system?

4. Did the court err in finding the plaintiffs failed to establish liability on the part of the defendant?

5. Did the trial court err in finding the plaintiffs had " . . . in essence, brought a products liability case"?

■■■ The scope of our review of this case is governed by Rule 52(a), N.D.R. Civ.P., which provides that this court will not set aside a finding of fact unless it is clearly erroneous. A finding of fact of the trial court will be held clearly erroneous only when the reviewing court, considering the entire evidence, is left with a definite and firm conviction that a mistake has been made. *Stee v. "L" Monte Industries, Inc.,* 247 N.W.2d 641 (N.D.1976). The fact we might have reached a different result had we tried the case does not make a finding of fact clearly erroneous. *Anderson v. Mooney,* 279 N.W.2d 423 (N.D.1979).

We have in this appeal experienced some difficulty in determining what facts were the basis for the court's conclusion that the

Grosses failed to prove liability on the part of Sta-Rite. This difficulty arose because the findings of fact outline the evidence on both sides of the contested issues of fact.[2]

■■■ However, although the findings of fact and conclusions of law should be stated with sufficient specificity to assist us and afford us a clear understanding of the trial court's decision, we have indicated that if we understand from the findings the factual basis for the trial court's determination, the findings are adequately specified. *Park View Manor, Inc. v. Housing Authority of Stutsman County,* 300 N.W.2d 218 (N.D. 1980). Thus, although findings of fact could be more definite, this alone does not make them erroneous. *Schmidt v. Plains Elec., Inc.,* 281 N.W.2d 794 (N.D.1979). As we indicate in our following discussion, we believe the findings are adequate to permit us to understand the factual basis for the trial court's determination.

I

Did the court err in finding that portions of the entire milking operation were installed by someone other than the defendant corporation without finding that the defendant corporation was responsible for the entire installation and the coordination of other components?

The Grosses would have us reverse on the basis of the trial court's failure to specifically find that Sta-Rite was responsible for the installation and integration of all the components of the new milking operation, some of the components having been designed and manufactured by other compa-

2. The findings were prepared by counsel for Sta-Rite at the direction of the trial judge. The trial judge filed a memorandum opinion and the findings in essence quote the memorandum opinion. The memorandum opinion is a guide to counsel in preparing findings. If the trial judge thought the memorandum opinion would merely be repeated in the findings, presumably he would not direct that findings be prepared but rather would direct that the memorandum opinion stand in lieu of findings of fact and conclusions of law. Rule 52(a), N.D.R.Civ.P.; *Brunsdale v. Bagge,* 224 N.W.2d 384 (N.D. 1974). In *Peterson v. Hart,* 278 N.W.2d 133 (N.D.1979), we indicated that although it is not sufficient to find as fact that the plaintiff has or has not proved his case, neither is it appropriate to use findings of fact for a mere recitation of the evidence. An attorney directed by the court to prepare findings of fact for the court's signature bears a responsibility for preparing those findings in a manner consistent with our previously stated reasons for the rule requiring findings of fact, i.e., to enable the appellate court to understand the factual determination made by the trial court as the basis for its conclusions of law and judgment entered thereon. *Hust v. Hust,* 295 N.W.2d 316 (N.D.1980).

nies.[3] We do not believe, however, that the omission of such a finding is cause for a reversal.

The record is clear that those components which were not manufactured by Sta-Rite were not defective or negligently installed.

The Sta-Rite milking system is argued by the Grosses to be the cause of the mastitis because of alleged problems with excess fluctuation in the vacuum level. This variation in the vacuum level was not argued as being attributable to the manner in which the Sta-Rite components were integrated with the non-Sta-Rite components.

█ Because the Grosses did not show how the non-Sta-Rite components contributed in any way to the mastitis problem, we see no need to require the trial court to find that Sta-Rite was responsible for the entire installation and coordination of the other components.

## II

Did the court err in finding that the plaintiffs' expert relied upon another's tests and findings to reach the conclusion that the milking system caused the damage to the plaintiffs?

The trial court found:

"13.

"Dr. Judy Olson, a veterinarian called by the Plaintiff, ... testified that she observed the milking and found that when the cows presented themselves for milking, their teats were of normal color; by the time milking was complete they were blue and that this indicated to her that hemorrhaging was occurring. She believed that based upon the findings of Dr. McDougal, the milking system was causing the problem. She additionally tested the herd for mastitis and found that 43 cows showed indication of this infection."

Dr. McDougal performed a Babson Levograph test from which he determined that the milking system created an inverse milk-to-rest ratio of 44 to 56. At trial Dr. Olson was asked on direct examination a hypothetical question based on a 44-to-56 milk/rest ratio. Our review of the record indicates that Dr. Olson relied on the information available from Dr. McDougal's test only insofar as that information was presented to her in the form of a hypothetical question.

The Grosses contend that the trial judge gave some weight to the fact he found Dr. Olson to have relied on Dr. McDougal's tests because this was specifically stated in a finding. Their position is that the trial judge specifically found Dr. Olson "believed that based upon the findings of Dr. McDougal, the milking system was causing the problem," and the finding therefore indicates that the trial court discounted Dr. Olson's testimony that she personally observed the Grosses' milking operation and based her conclusion upon those observations and her own expertise.

The trial court's finding No. 13 clearly indicates the court's recognition of Dr. Olson's personal observations of the Grosses' milking operation. The court's next sentence that "[s]he believed that based upon the findings of Dr. McDougal, the milking system was causing the problem" can be read in isolation or in the context of the entire findings of fact. If we interpret it in isolation we might agree with the Grosses that the trial court discounted Dr. Olson's testimony about her personal observations as contributing to her conclusion that the milking system was the primary cause of the mastitis. If we interpret the trial judge's statement in the context of the entire findings of fact, the Grosses' argument raises the following question: As a result of his finding that Dr. Olson based her conclusion on Dr. McDougal's test results, to what extent did the trial judge discount or reduce in weight Dr. Olson's testimony about her personal observations as contributing to her conclusion that the

---

**3.** Sta-Rite did not design or put in the full prep stalls, crowd gate, pneumatic gate, and rotary platform.

milking system was the primary cause of the mastitis?

 The amount of weight given to any source of evidence is within the province of the trial court. "Our standard of review of a district court's finding of fact is *not*, however, a redetermination of the weight of the evidence." *George v. Compson*, 251 N.W.2d 743, 745–746 (N.D.1977), quoted in *Hoge v. Burleigh Cty. Water Management Dist.*, 311 N.W.2d 23, 28 (N.D. 1981). Our review of the record and our analysis of finding of fact No. 13 reveal no indication of the weight given or not given by the trial judge to Dr. Olson's testimony based on her personal observations. The Grosses have not convinced us that finding of fact No. 13 indicates that the testimony of Dr. Olson was discounted by the trial judge to the extent that a reversal by this court would be justified.

Finding of fact No. 13 can also be interpreted as an attempt to recognize that Dr. Olson's testimony was based in part on hypothetical questions using the findings of Dr. McDougal as well as her own observations.

To the extent that Dr. Olson relied on the Babson Levograph test results of Dr. McDougal, we note that the record contains evidence by Sta-Rite's expert witnesses, Dr. Kirkbride and Dave Heggen, which casts serious doubts on the accuracy of the Babson Levograph, its ability to measure milk/rest ratios, and the manner in which Dr. McDougal conducted and interpreted his test. In addition, Dr. Kirkbride, a veterinarian and expert in mastitis, testified that even if the actual milk/rest ratio was 44 to 56, it would not harm the cows nor cause mastitis. The trial court recognized this evidence in its findings of fact No. 14 and 15, which state:

"14.

"Defendants presented a witness, one Dave Heggen, a representative of the Defendant at the time the equipment was sold, and he testified regarding the use of the levograph. Heggen stated that it would be impossible to determine the milk rest ratio as attempted by Dr. McDougal. He stated that he believed that at the time the system was operational, that the vacuum was working good and that the largest problem was with nervousness of the herd towards the new equipment and further, he stated in his opinion that the problems of Plaintiffs would have disappeared in a short period of time and once the cattle had adapted to the new machinery, if appropriate cleansing proceedings were followed.

"15.

"Dr. Kirkbride, an expert in mastitis, testified that even if the milk rest ratio was as indicated by Dr. McDougal, this could not be the cause of mastitis. Dr. Kirkbride agreed that a variation in vacuum level could be a cause of mastitis. Dr. Kirkbride also testified that he believed that the cleansing of the cows and the proper care of mastitis once it is detected in the herd was most important to prevent further problems."

Because the findings of fact in this case, as illustrated by findings of fact No. 13, 14, and 15 quoted above, present to us a summary, more or less, of the testimony of each witness for either side, we are unable to determine specifically which findings of fact the trial court actually relied upon to reach its conclusion. We note, however, the trial court's finding of fact No. 16, which states:

"16.

"From a review of the evidence, the Court is unable to determine the cause of the mastitis and the Court finds that no evidence exists of any excess variation in the vacuum pressure of the milking system. Although leakage in the system was testified to, there was no testimony as to variance, which would harm the cows."

 We believe this finding, read in the context of findings No. 13, 14, and 15, indicates, essentially, that the trial court accepted the testimony of Sta-Rite's witnesses over that of the Grosses' witnesses. Such being our interpretation we will not at-

tempt to weigh conflicting testimony when it has already been weighed by the trial court.

Although we may not have viewed the testimony in the same light as did the trial court, there is sufficient evidence in the record to support its findings and its decision must be upheld. Rule 52(a), N.D.R. Civ.P.

### III

Did the court err in finding no evidence exists of any excess variation of the vacuum pressure in the milking system?

The court, in finding of fact No. 16, recognized that there was leakage in the milking system but found that there was no evidence of any excess variation in the vacuum pressure of the milking system which would harm the cows.

To support their attack on this finding the Grosses direct our attention to testimony from several witnesses about a fluctuating vacuum-pressure gauge. Sta-Rite produced witnesses whose testimony indicated that the fluctuation in the vacuum gauge was due to vibration. The Grosses produced testimony that the fluctuation was not due to vibration.

There is no dispute as to the existence of leaks in the milking system. The Grosses focus on those leaks and argue that the leaks caused an excess variation in the vacuum pressure that would harm the cows. The record, however, does not indicate that the leaks in the Grosses' system were so extensive that they caused the vacuum to fluctuate or fall lower than acceptable industry tolerances. Sta-Rite's expert, Dr. Kirkbride, testified that leaks in a vacuum system per se will not cause mastitis, except when the leaks are so extensive that the reserve capacity of the pump working in combination with the vacuum regulator cannot maintain a proper vacuum level in the system, resulting in a fluctuating vacuum or an overall lowered vacuum level. Dr. Kirkbride also testified that Dr. McDougal's procedure with the Levograph would not achieve the necessary measurement of the milking vacuum to determine if it was the

cause of the Grosses' problem. In addition, a Sta-Rite representative testified at trial that he checked the milking vacuum at the teat end and that it "looked good."

Resolution of this issue involves the trial court's weighing of the evidence and its decision with respect to conflicting evidence. It found in favor of the testimony presented by Sta-Rite and there is sufficient evidence to support the trial court's decision.

### IV

The Grosses argue that Sta-Rite is liable for the mastitis outbreak under theories of express warranty, implied warranty of merchantability, and negligence.

Liability for breach of express warranty is sought on the basis that Sta-Rite falsely warranted on brochures that its dealers were specially trained and kept up to date to serve consumers properly and that the dealers were "backed up one hundred percent by a qualified factory representative and the Sta-Rite Dairy Department and Dairyman Service." The Grosses produced testimony by Rath, the local Sta-Rite dealer, that he had no formal training by Sta-Rite. Testimony by Schumacher, Rath's distributor, shows that Rath had no training in installing the type of system purchased by the Grosses.

Liability against Sta-Rite is also argued on the basis of Section 41–02–31, N.D.C.C., which provides, in pertinent part:

"41–02–31. [Uniform Commercial Code § 2–314] *Implied warranty—Merchantability—Usage of trade.*—1. Unless excluded or modified (section 41–02–33), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. . . .

"2. Goods to be merchantable must be at least such as

"a. . . .

"b. . . .

"c. are fit for the ordinary purposes for which such goods are used; and . . ."

The Grosses' position is that the milking system, as installed by Sta-Rite, was not fit for its ordinary purpose of milking cows. They contend that the unfitness of the machinery was "made evident by the fact that the problems arose as soon as the apparatus was put into operation." This statement, in the context of the Grosses' claim of damage from the mastitis, however, approaches a res ipsa loquitur argument which never was raised as a theory in the case. We note also that the record contains testimony about other factors which may have contributed to the mastitis.

In addition to our above discussion, it must be noted that the Grosses' attempt to impose liability for the mastitis problem presupposes the existence of a defect in the milking system resulting in a breach of warranty. Such an argument is unpersuasive in light of the trial court's conclusion that the Grosses failed to prove a defect that would harm the cows—specifically to prove an excess variation in the vacuum pressure of the milking system. Liability based on breach of warranty cannot attach unless there is proof of a defect causing damage. *Herman v. General Irrigation Co.*, 247 N.W.2d 472 (N.D.1976).

In the instant case, the Grosses strenuously argue that the trial court overlooked the single fact that "[t]he milking system just didn't work!" Sta-Rite's response to this argument is that, notwithstanding the possibility of their existence, the defects and breaches of warranty asserted by the Grosses could not have caused the mastitis in their herd. There was testimony to support Sta-Rite's position and the trial court was persuaded to find in that direction. This was not clearly erroneous.

The Grosses' third ground for liability for the mastitis is based on negligent installation of the system by Sta-Rite. It is uncontradicted that a number of complaints were voiced about the installation of the system. This ground for liability fails, however, because there is testimony by Dr. Kirkbride, which the trial court accepted, that the defects or problems complained of would not cause mastitis. These defects, however, are significant with respect to the Grosses' claim based on breach of contract which is discussed later in this opinion.

## V

Did the trial court err in finding the plaintiffs had ". . . in essence brought a products liability case"?

The Grosses focus on the trial court's language in finding of fact No. 3 that they ". . . in essence, brought a products liability case against said Defendants." The Grosses point out that they withdrew any allegations in their complaint that smack of products liability and proceeded on theories of negligence and breach of warranty. They argue, therefore, that the trial court clearly erred by finding a failure to prove liability on the part of Sta-Rite under a theory of products liability when, in fact, the Grosses were not proceeding under that theory at all.

The court's reference in its finding to "a products liability case," however, refers to the fact that the Grosses were claiming damage which arose from a product, the Sta-Rite milking system. The court was not stating that the Grosses failed to prove a case under what is properly termed a theory of strict liability in tort. This court has recognized that a products-liability case can be based upon negligence [*Seibel v. Symons*, 221 N.W.2d 50 (N.D.1974)] and warranty [*Herman v. General Irrigation Co., supra*].

The record indicates that the trial court understood the theories under which the Grosses were proceeding, as illustrated by the following exchange between the court and the Grosses' counsel:

"MR. HEUSTIS: Your Honor, as I review the pleadings, I see there is language there as to products liability and—

"THE COURT: I don't think there is any proof of that in this case. It seems to me that any proof, if the Court is going to rule, the proof would have to be in the negligence of the construction or something of this particular facility,

which you have. What you have shown me is there is some vacuum leaks and resulting mastitis, and there is a gauge that was set wrong for supposedly at least your expert says that the timing on that thing is a reciprocal of where it should have been, or at least wrong.

"It appears you are on a negligence theory or maybe a warranty theory.

"MR. HEUSTIS: The breach that flows from the Warranty Contract, yes, so to simplify the issues for the Court we are going to withdraw any of the allegations contained in the Complaint that smacks of products liability."

The Grosses' argument with respect to this issue is based upon a too-narrow interpretation of the term "products liability," which was not intended by the trial court in its finding of fact. The finding was not clearly erroneous.

### BREACH OF CONTRACT

Having expressed our opinion with respect to the trial court's decision regarding the Grosses' claim against Sta-Rite for the mastitis outbreak, we next examine the Grosses' claim based on breach of contract. The record clearly shows that the Grosses did not receive a properly installed or properly operating milking system. The evidence is uncontroverted that there were numerous leaks in the vacuum system, that some copper tubing was installed contrary to North Dakota regulations, and that there were other defects. Although the trial court found these things would not cause mastitis, it is clear the defects existed and the trial court made no finding with respect to the damage from these defects except that they did not cause mastitis. We find it necessary, therefore, to remand this case to the district court for further findings with respect to the defects in the milking system and the damage resulting therefrom, exclusive of the claim for mastitis.

■ A purchaser of new equipment is entitled to a proper installation of that equipment in accordance with State requirements. To hold otherwise would give consumers no way to remedy defects in newly installed equipment merely because it has yet to cause damage, and also would encourage poor performance by product manufacturers and installers as well as disrespect for State regulations.

The Grosses were entitled to a new milking operation free from defects and in conformance with applicable State requirements. They did not get one from Sta-Rite.

For the above reasons we remand this case to the district court for further consideration of the defects in the milking system and any resulting damage, exclusive of the mastitis claim. In all other respects the judgment of the district court is affirmed. No costs are awarded to either party.

ERICKSTAD, C. J., and SAND, PAULSON and PEDERSON, JJ., concur.

PEDERSON, Justice, concurring specially.

I agree with the opinion authored by Justice VandeWalle and only add some comments in order to try to impress more strongly upon trial judges that Rule 52, NDRCivP, will work, with a little understanding and effort, to reduce the burden on the judiciary at both levels. If I had authored the majority opinion, as long as the case was being remanded anyway, I would have asked for a rewrite of every finding of fact which finds that someone testified to something or other. Ordinarily, any statement labeled "finding of fact" which does not provide a final answer to a disputed "issue of fact" is either surplusage or "clearly erroneous." Obviously, the issues of fact arise out of what happened out on the Gross farm—not what happened in the courtroom.

The requirement that trial courts prepare findings of fact when there is a trial by the court goes back to territorial days. Sections 266–269 of the Code of Civil Procedure, Revised Codes of Dakota (1883), required written decisions with separately stated findings and conclusions, and authorized the judge to call on the parties to assist in the process of preparing them. Those same provisions became §§ 5450–

5453 of the Revised Codes of the State of North Dakota (1895) and, ultimately, Chapter 28–16, NDCC, which was superseded by the North Dakota Rules of Civil Procedure.

The one thing that Rule 52, NDRCivP, really accomplished was to make the trial court's findings final, and thus § 28–27–32, NDCC, which authorized trial de novo, was repealed. When an appellate court has to speculate as to what the trial court really found, it encroaches on the trial court function. Only by improving findings of fact will we ever totally eliminate appellate trial de novo.