2004 ND 169

**SMITH ENTERPRISES, INC., d/b/a
D & M Phone Cards, Plaintiff
and Appellant**

v.

**IN–TOUCH PHONE CARDS, INC.,
and James Wolf, Defendants
and Appellees.**

No. 20040039.

Supreme Court of North Dakota.

Aug. 31, 2004.

Ronald H. McLean (argued) and Brad A. Sinclair (on brief), Serkland Law Firm, Fargo, N.D., for plaintiff and appellant.

Joseph A. Turman (argued), and Katrina Turman (argued), third-year law student, DeMars & Turman, Fargo, N.D., for defendants and appellees.

KAPSNER, Justice.

[¶ 1] Smith Enterprises, Inc., doing business as D & M Phone Cards, appealed from an order denying its post-trial motions and from a judgment dismissing its complaint against In–Touch Phone Cards, Inc., and its general manager and co-owner, James Wolf, and awarding In–Touch and Wolf $9,520.23, plus interest and costs, on their counterclaim. We affirm.

I

[¶ 2] In–Touch is in the business of acquiring long distance telephone services from long distance service providers and selling prepaid phone cards for those services. In–Touch sells prepaid phone cards directly to retailers and also produces prepaid phone cards for sale to other companies, who sell those cards to retailers. Dennis Smith is the president and principal officer of Smith Enterprises, an entity that purchases prepaid phone cards from suppliers and sells those cards to retailers.

[¶ 3] In April or May 2000, Smith and Wolf met at a Fargo restaurant to discuss a potential business relationship. Wolf agreed to print some In–Touch phone cards for Smith Enterprises to determine whether there was a viable market for those phone cards. Smith and Wolf subsequently entered into an oral business relationship in which Smith Enterprises bought phone cards from In–Touch for a percentage of the face value of the card, and Smith Enterprises sold those cards to retailers. In–Touch initially developed two logo or custom phone cards for Smith Enterprises. One card, with a windmill on the faceplate, had a two cent per minute charge for long distance services plus a connection fee. The other card had a golfer on the faceplate carried a five cent per minute charge with no connection fee. Both cards identified "D & M Phone Cards" on the faceplate and were available in $5, $10, and $20 denominations.

[¶ 4] In–Touch subsequently developed a "dual" barn card for Smith Enterprises. The dual card had a barn on the faceplate and offered two different rates per minute with different connection fees. The dual

barn card also named "D & M Phone Cards" on the faceplate and was available in $5, $10, and $20 denominations. In May 2001, In–Touch permitted Smith Enterprises to return some windmill and golfer cards from Smith Enterprises' inventory in exchange for dual barn cards. In–Touch also developed a Stop–N–Go card and a Cenex card for Smith Enterprises to sell to those customers.

[¶ 5] In–Touch claimed Smith Enterprises had agreed to exclusively sell In–Touch's phone cards, and in May 2001, Wolf learned Smith Enterprises was selling other brands of phone cards. Wolf testified Dennis Smith advised him that Smith Enterprises had received a better deal from another supplier and "it was just business." Dennis Smith testified one of his salespersons informed him that In–Touch had terminated its relationship with Smith Enterprises. In May 2001, In–Touch sent Dennis Smith an undated letter advising Smith that In–Touch would continue to sell Smith Enterprises dual barn cards for the same percentage of the face value of the card with no exchanges and with all sales final and payable by cashiers check on delivery. The letter also indicated In–Touch had incurred expenses for producing 60,000 phone cards for Smith Enterprises. On June 22, 2001, Dennis Smith made a final purchase of phone cards from In–Touch under the terms of that undated letter.

[¶ 6] In–Touch later made one sale of Stop–N–Go phone cards directly to Stop–N–Go. Wolf testified he was attempting to liquidate unsold Stop–N–Go cards that had been produced for Smith Enterprises. In June or July 2001, In–Touch also began doing business directly with a Cenex promotional group, an entity that had been a customer of Smith Enterprises. According to Clark Erickson, a representative of the Cenex promotional group, Erickson contacted In–Touch after Smith Enterprises terminated its relationship with the Cenex promotional group.

[¶ 7] Smith Enterprises claimed it had a distributorship agreement with In–Touch, and In–Touch terminated the agreement without notice. Smith Enterprises sued In–Touch and Wolf, alleging they tortiously interfered with Smith Enterprises' contractual rights, tortiously interfered with its economic advantage, breached the parties' oral distribution agreement, and breached the parties' implied contracts. In–Touch counterclaimed for production costs for cards that In–Touch had produced specifically for Smith Enterprises and that In–Touch retained in its inventory. After a bench trial, the court entered judgment dismissing Smith Enterprises' claims against In–Touch and Wolf and awarding In–Touch and Wolf $9,520.23, plus interest and costs, on their counterclaim. The trial court denied Smith Enterprises' post-trial motions for a new trial and to alter or amend the judgment.

## II

[¶ 8] Smith Enterprises argues the trial court's findings are clearly erroneous and the court erred in dismissing its complaint against In–Touch and Wolf.

[¶ 9] A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if no evidence exists to support the finding, or if, on the entire record, we are left with a definite and firm conviction a mistake has been made. *Hogan v. Hogan*, 2003 ND 105, ¶ 6, 665 N.W.2d 672. A trial court's choice between two permissible views of the weight of the evidence is not clearly erroneous, and simply because we may have viewed the evidence differently does not entitle us to reverse the trial court. *Id.* (quoting *Schmaltz v. Schmaltz*, 1998 ND 212, ¶ 6,

586 N.W.2d 852). On appeal, we do not reweigh conflicts in the evidence, *see Center Mut. Ins. Co. v. Thompson,* 2000 ND 192, ¶ 20, 618 N.W.2d 505, and we give due regard to the opportunity of the trial court to judge the credibility of the witnesses. N.D.R.Civ.P. 52(a).

### A

[¶ 10] Smith Enterprises initially claims the trial court's adoption of In–Touch's proposed findings of fact and conclusions of law without any changes requires reversal of the court's decision.

[¶ 11] After trial, the judge asked both parties to prepare proposed findings of fact. The trial court adopted In–Touch's proposed findings of fact and conclusions of law. The court did not prepare its own findings of fact, and we do not approve as a practice the court's wholesale adoption of one party's proposed findings of fact. *See Schmidkunz v. Schmidkunz,* 529 N.W.2d 857, 858–59 (N.D.1995); *Warner v. Johnson,* 213 N.W.2d 895, 898–99 (N.D.1973). However, when the court signed In–Touch's proposed findings, those findings became the court's findings, and if they adequately explain the basis of the court's decision, they will be upheld on appeal unless clearly erroneous under N.D.R.Civ.P. 52(a). *See McDowell v. McDowell,* 2003 ND 174, ¶ 8, 670 N.W.2d 876; *Hendrickson v. Hendrickson,* 553 N.W.2d 215, 218 (N.D.1996); *Schmidkunz,* at 858–59. Although we prefer that trial courts prepare their own findings of fact, we reject Smith Enterprises' argument that the court's wholesale adoption of In–Touch's proposed findings of fact, by itself, is reason to reverse the court's decision.

### B

[¶ 12] Smith Enterprises argues the trial court erred in characterizing the relationship between the parties as a series of sales contracts evidenced by invoices. Smith Enterprises argues the evidence demonstrates the parties entered into an oral distributorship agreement, In–Touch terminated the distributorship agreement without notice, and the Uniform Commercial Code provisions for course of dealing and custom and trade usage supplement the terms and conditions of the parties' agreement. Smith Enterprises argues the parties' course of dealing and custom and trade usage establish it had been allowed to exchange cards without paying for the costs of production for the returned cards.

[¶ 13] The parties did not enter into a written agreement regarding the terms of their business relationship. However, neither party disputes there was an oral arrangement between them for In–Touch to supply phone cards to Smith Enterprises. A determination of the terms of an oral contract must be made by the trier of fact and will be reversed on appeal only if clearly erroneous. *Tallackson Potato Co., Inc. v. MTK Potato Co.,* 278 N.W.2d 417, 422 (N.D.1979). In commercial contexts, a written agreement may be explained or supplemented by course of dealing, course of performance, or usage of trade. *Campbell Farms v. Wald,* 1998 ND 85, ¶ 17, 578 N.W.2d 96. Course of dealing and custom and usage are questions to be determined by the trier of fact. *See Id.* at ¶ 17, n. 4; *North Dakota Pub. Serv. Comm'n v. Central States Grain, Inc.,* 371 N.W.2d 767, 776 (N.D.1985); *Urbana Farmers Union Elevator Co. v. Schock,* 351 N.W.2d 88, 92 (N.D.1984).

[¶ 14] Some of the trial court's findings are a summary of testimony presented at trial on disputed factual issues without an explicit resolution of the factual dispute. A trial court's recitation or summary of testimony presented at trial does not satisfy the requirement that findings of

fact must be stated with sufficient specificity. *Estate of Polda,* 349 N.W.2d 11, 13–14 (N.D.1984); *Gross v. Sta–Rite Indus., Inc.,* 322 N.W.2d 679, 682 (N.D.1982); *Peterson v. Hart,* 278 N.W.2d 133, 136 (N.D.1979). In *Gross,* at 682, some of a trial court's findings outlined the evidence presented at trial on both sides of disputed issues of fact. We said findings of fact should be stated with sufficient specificity to afford a clear understanding of the court's decision, and findings are adequate if we can determine the factual basis for the court's ultimate decision. *Id.* at 682. Although the trial court's findings in this case include some mere recitations of the testimony presented at trial, we are able to ascertain the basis of the court's decision and the findings are adequate for our review.

[¶ 15] The trial court found In–Touch did not provide Smith Enterprises with a system or plan for selling the phone cards, and after Smith Enterprises purchased the phone cards from In–Touch, Smith Enterprises had no obligation to In–Touch beyond paying for the cards. The court found there was no franchise agreement between the parties and Smith Enterprises was not forbidden from selling In–Touch's phone cards after the termination of their relationship. The court found there was no agreement between the parties beyond a series of individual contracts, evidenced by invoices, for In–Touch to sell and Smith Enterprises to buy the phone cards. The court found In–Touch had promptly remedied any defective phone cards and, on two separate occasions, In–Touch had allowed Smith Enterprises to exchange phone cards of different denominations to level off Smith Enterprises' stock. The court found Smith Enterprises was free to continue to sell In–Touch's phone cards with no obligation to In–Touch other than payment, and In–Touch would continue to exchange any defective cards. Contrary to Smith Enterprises' claims that In–Touch terminated the business relationship with Smith Enterprises, the court's findings explain that In–Touch's relationship with Smith Enterprises was not terminated after In–Touch discovered Smith Enterprises was selling other brands of phone cards in May 2001. The court effectively found there was no distributorship agreement between the parties, In–Touch did not breach any business or contractual arrangement between the parties, and In–Touch would continue to sell phone cards to Smith Enterprises for a percentage of the face value of the card but there would be no further exchanges and all sales would be final. The court also found there was an "implied condition precedent" between the parties for Smith Enterprises to pay for the costs of printing custom cards if Smith Enterprises stopped purchasing custom cards from In–Touch and In–Touch retained any of the unsold custom cards in its inventory. While the terminology drafted by In–Touch and adopted by the court is imprecise, the clear import of the finding is a determination that Smith had agreed to pay printing costs for custom cards.

[¶ 16] Although there is some evidence that Smith Enterprises agreed to pay the costs of production for only the first batch of phone cards produced by In–Touch for Smith Enterprises, there is also some evidence that Smith Enterprises was responsible for the costs for all unsold phone cards that In–Touch produced for Smith Enterprises. Wolf testified:

Q. And you're the person in charge of inventory for logo cards of distributors?

A. Yes.

Q. And you're the person that kind of decides when to reorder cards and what quantities?

A. Actually I would talk to the distributor about his logo cards. When he thinks we should—

Q. Well, when you talk to this distributor about logo cards and when you think they should be reordered do you sit down and count the cards on hand and tell him what inventory is?

A. Yes.

Q. Do you do that every time you talk to the distributor about logo cards and about reordering?

A. About reordering I would. I would know approximately what we had on stock, in office.

Q. And do you recall specific conversations with Dennis Smith?

A. Yes.

Q. In which you—in which you told him you're going to reorder and you talked about quantities of reordering?

A. The quantities were always 5,000 minimum. But to reorder he always knew when I was reordering because he was getting low.

. . . .

Q. You contend you told Dennis Smith that you would tell him I'm reordering cards. My question is: Do you remember ever once, ever one occasion, where you told him here's the amount of cards I have on hand, here's what I'm reordering?

A. Every time.

. . . .

Q. Didn't discuss paying for any inventory if the relationship ended?

A. I think when we ordered—when we got the logos we discussed that.

Q. What was discussed then?

. . . .

A. That if you don't sell them all you pay is for the plastic.

Q. And at that time it was 5,000 cards?

A. Yes.

Q. That was ordered?

A. 5,000 in each denomination.

Q. And there's 3 denominations?

A. Yes.

Q. Is the conversation at that time was if you don't sell the 15,000 cards we're ordering for you you have to pay for the plastic?

A. Pay for the stock that's left.

Q. And you said pay for the stock?

A. Stock that's left, plastic.

Q. And the plastic would have cost 15 cents to 25 cents?

A. Yeah, somewhere in that—in that frame. It depended upon the plastic company we used.

Q. But did you ever have any other conversations with Dennis Smith after subsequent orders that if he didn't sell—

A. Every time we made a logo card we said that.

[¶ 17] Although there was some evidence to the contrary, Wolf's testimony supports a finding that the terms under which In–Touch agreed to supply phone cards to Smith Enterprises included a requirement for Smith Enterprises to pay for the costs of printing all custom cards if Smith Enterprises quit purchasing the custom cards from In–Touch and In–Touch retained those cards in its inventory. Smith Enterprises' reliance on any course of dealing and custom and usage is misplaced, because there was no written agreement between the parties and the trial court found the condition for payment of the costs of printing was a term of the parties' oral business relationship. We do not reweigh conflicts in the evidence, and we give due regard to the opportunity of the trial court to judge the credibility of the witnesses. N.D.R.Civ.P. 52(a). We are

not left with a definite and firm conviction the court made a mistake about the terms of the parties' oral business relationship. We therefore conclude the trial court's findings on that issue are not clearly erroneous.

## C

[¶ 18] Smith Enterprises argues the trial court erred in failing to find In–Touch wrongfully interfered with Smith Enterprises' business relationship with Stop –N– Go, the Cenex buying group, and other customers. Smith Enterprises argues In–Touch sold cards directly to Stop–N–Go and to the Cenex group after In–Touch terminated its relationship with Smith Enterprises. Smith Enterprises argues In–Touch made representations to those customers that Smith Enterprises was selling Florida cards that were no good and were frequently involved in bankruptcy proceedings, and that Smith Enterprises would be out of business in six months.

[¶ 19] In *Trade 'N Post, L.L.C. v. World Duty Free Americas, Inc.*, 2001 ND 116, ¶ 36, 628 N.W.2d 707, we said:

[I]n order to prevail on a claim for unlawful interference with business, a plaintiff must prove the following essential elements: (1) the existence of a valid business relationship or expectancy; (2) knowledge by the interferer of the relationship or expectancy; (3) an independently tortious or otherwise unlawful act of interference by the interferer; (4) proof that the interference caused the harm sustained; and (5) actual damages to the party whose relationship or expectancy was disrupted.

[¶ 20] In dismissing Smith Enterprises' claims for unlawful interference with business, the trial court found:

Smith has alleged that Wolf's statements to his customers is actionable. Wolf made statements to customers that Smith's calling cards were inferior to Wolf's and/or Smith's calling cards would be out of business in 6 months. In this case, Wolf testified that he was simply stating his opinion when he was asked by his various customers about the quality of Smith's cards. Wolf's statements about Smith's cards should be considered "puffing." Puffing is not actionable under the tort of interference with a business relationship. See *Speakers of Sport, Inc. v. ProServ, Inc.*, 178 F.3d 862 (7th Cir.1999). No witness testified that they relied on the statements to Smith's detriment.

F. Additionally, in order to satisfy the fourth element, there must be proof the interference caused the harm sustained. In other words, but for the actions of Wolf, Smith would have obtained the actual economic benefit. Evidence in this case was to the contrary.

G. There is no testimony that In–Touch's sale to Stop–N–Go was a result of any tort[i]ous conduct on the part of In–Touch.

H. Clark Erickson and Betty Wetstein testified that nothing that Wolf said with regard to Smith's products had any influence on Cenex promotional group's decision to purchase products from In–Touch.

I. Insofar as any claim for lost sales to Cenex corporate is concerned, there is no evidence to show that Cenex corporate would have contracted with Smith. There is no competent evidence to show that Wolf or In–Touch committed any actions which resulted in the Cenex corporate contract for phone cards going to Qwest as opposed to Smith.

J. The contacts which In–Touch or any of its representatives made with Smith's salespersons did not cause any sales person to leave Smith's employ-

ment or otherwise stop selling Smith's products. As a result, there is no proof that any of the statements made to the salespersons or independent sales agents caused any harm.

[¶ 21] There was evidence that the reason Smith Enterprises no longer sold phone cards to Stop–N–Go and the Cenex group was unrelated to In–Touch's conduct. After a review of the evidence presented at trial, we are not left with a definite and firm conviction the court made a mistake in finding In–Touch's actions did not cause harm to Smith Enterprises. We therefore conclude the court's findings on the tortious interference claim are not clearly erroneous, and the court did not err in dismissing that claim.

### III

[¶ 22] Smith Enterprises argues the trial court erred in failing to grant it a new trial and in failing to alter or amend the judgment, because the evidence was insufficient to justify the findings of fact and conclusions of law. We review these issues under the abuse-of-discretion standard. *See First Western Bank & Trust v. First Lutheran Church,* 2003 ND 21, ¶ 15, 656 N.W.2d 726; *Sollin v. Wangler,* 2001 ND 96, ¶ 8, 627 N.W.2d 159. In denying Smith Enterprises' post-trial motions, the trial court acknowledged the parties had presented two different versions of their business relationship. The court concluded the manifest weight of the evidence was more than sufficient to support the court's findings, and that evidence indicated the parties' business relationship was a series of individual contracts. The court also said Smith Enterprises had failed to prove there was a franchise relationship, tortious interference with a business relationship, misappropriation of trade secrets, or breach of contract. We have concluded the trial court's findings are not clearly erroneous, and we also conclude the court did not abuse its discretion in denying Smith Enterprises' post-trial motions.

### IV

[¶ 23] We affirm the judgment and the post-trial orders.

[¶ 24] GERALD W. VANDE WALLE, C.J., MARY MUEHLEN MARING, WILLIAM A. NEUMANN, and DALE V. SANDSTROM, JJ., concur.