**Jean D. REICHENBACH, a single woman, Plaintiff-Appellee,**

**v.**

**David H. SMITH et al., Defendants, Michael C. Bark and State Farm Fire & Casualty Co., Defendants-Appellants.**

No. 75–2133
Summary Calendar.*

United States Court of Appeals, Fifth Circuit.

March 19, 1976.

---

* Rule 18, 5 Cir.; see *Isbell Enterprises, Inc. v. Citizens Casualty Company of New York et al.,* 5 Cir., 1970, 431 F.2d 409, Part I.

Steven R. Berger, Miami, Fla., for defendants-appellants.

Jon E. Krupnick, Ft. Lauderdale, Fla., for plaintiff-appellee.

Before BROWN, Chief Judge, GODBOLD and GEE, Circuit Judges.

JOHN R. BROWN, Chief Judge:

A jury in this maritime case awarded plaintiff Reichenbach $25,000 for injuries she suffered in a collision of two small boats on the Florida intracoastal waterway. The losing defendants, pilot of the other boat and his insurance company, appeal the Trial Court's refusal to admit evidence of a "Mary Carter" settlement made during trial between Reichenbach and codefendant Woodcock. We do not think Mary Carter escalates to prejudicial error and affirm.

After dinner at a waterfront restaurant, Ms. Reichenbach and Major Woodcock were proceeding south in the small boat HONEY BUN VI on the intracoastal. M/V HONEY BUN VI, piloted by Woodcock, collided with a 24 foot Seawind operated by defendant Michael Bark. Ms. Reichenbach suffered serious injury to her left arm. She sued alleging admiralty jurisdiction, 28 U.S.C.A. § 1333(1), and the parties stipulated that the case would be tried under comparative negligence.[1]

The major point of dispute at trial was the location of the vessels at the time of impact.[2] Major Woodcock, operator of M/V HONEY BUN VI, testified that he was 50 to 75 feet from the western seawall.[3] Bark, the pilot of the Seawind, claimed at trial to have been in the middle of the waterway.[4] The intracoastal waterway is approximately 300 feet wide at the point of collision.[5] The boats were near the western seawall when the first witnesses arrived after collision, but Bark claimed that the collision occurred in the middle of the waterway and that the boats were then dragged toward the western seawall.[6]

At the beginning of the trial Bark's counsel moved for the production of any settlement agreements between Woodcock and Ms. Reichenbach.[7] Woodcock's attorney stated—and there is no dispute as to it—that there was an outstanding settlement offer proposed by Reichenbach but the parties had not reached an agreement.

---

1. R. 312.

2. Tr. 370. The presence of operating lights on both boats was also at issue.

3. Tr. 186–87.

4. Tr. 337.

5. Tr. 338.

6. Tr. 128, 166, 366–73, 380.

7. Bark was particularly interested in any "Mary Carter" type agreements, covenants not to sue, releases, or contigent settlements. The term "Mary Carter" agreement comes from *Booth v. Mary Carter Paint Co.,* Fla.App.2d, 1967, 202 So.2d 8, and has been defined by the Florida Supreme Court as "a contract by which one co-defendant secretly agrees with the plaintiff that, if such defendant will proceed to defend himself in court, his own maximum liability will be diminished proportionately by increasing the liability of the other co-defendants." *Ward v. Ochoa,* Fla., 1973, 284 So.2d 385, 387.

Eight days after trial had begun, Reichenbach's attorney announced to the Court out of the presence of the jury that a settlement had been reached between plaintiff and Woodcock and his insurance company.[8] Probably the settlement was not made until that day, but, in any event, it is undisputed that Woodcock did not know of it until that day, and he had already testified several days earlier. Bark's attorney then requested that the Judge inform the jury of the terms and conditions of the settlement.[9] The Judge ruled that the jury should not be informed of the settlement and allowed a voluntary dismissal of Woodcock.

Woodcock's attorney offered to have him testify to his lack of personal knowledge about the settlement negotiations since it was made by his underwriters. The trial judge did not consider that necessary. Woodcock's testimony could not have been affected by what he did not know. Bark did, however, renew his motion to inform the jury and inquired of the Court whether he properly could cross-examine Ms. Reichenbach about the agreement. The trial judge said that only evidence of a pretrial agreement would be admissible for impeachment.[10] Ms. Reichenbach testified but, conforming to the Court's earlier ruling, defense counsel asked no questions on cross concerning the settlement. The jury found that Michael Bark's negligence proximately caused the collision and awarded Ms. Reichenbach $25,000.00 damages.[11]

On appeal Bark claims that evidence of a "Mary Carter" agreement should have been admitted for the purpose of impeaching Woodcock's and Ms. Reichenbach's testimony. Bark also complains of the trial judge's refusal to allow cross-examination of Ms. Reichenbach, who testified immediately after the settlement was announced to the Court.[12]

At the outset, the admission or exclusion of evidence is largely within the discretion of the trial court. *Harrington v. C. I. R.,* 5 Cir., 1968, 404 F.2d 237, 241; see *Stancill v. McKenzie Tank Lines, Inc.,* 5 Cir., 1974, 497 F.2d 529, 535. Absent an abuse of discretion, as shown by "manifest error", this Court will not reverse the decision of the trial judge. *Stancill, supra* at 535.

A primary reason for excluding evidence of a compromise is to encourage non-litigious solutions to disputes. Admission of evidence of the settlement could work to discourage plaintiffs and defendants from settling with one or more of several codefendants. *See Cates v. United States,* 5 Cir., 1971, 451 F.2d 411, 415–16. With today's burgeoning dockets and the absolute impossibility of Courts ever beginning to think that they might even be able to hear every case, the cause of justice is advanced by settlement compromises shepardded by competent counsel, whose experience as advocates makes them reliable predictors of litigation were it pursued to the bitter end.

---

8. App. 68, Tr. 392. Under the terms of the settlement Woodcock's insurer was liable for up to $3,000.00 of any verdict in excess of $25,000.00 if such excess could not be collected from Bark.

9. Defense counsel cited Florida case law as supporting this, but as this was a maritime case the federal law was controlling. *Branch v. Schumann,* 5 Cir., 1971, 445 F.2d 175, 176.

10. The Judge stated in an order filed March 17, 1975, that he believed that evidence of the settlement would confuse the jury "in view of the parties subsequent settlement and the law on divided damages." R. 434.

11. The jury found that neither codefendant Donald Bark, Michael Bark's father and owner of the Seawind, nor Ms. Reichenbach was guilty of any negligence proximately causing the collision. R. 376. Since Woodcock had been dismissed as a party, the jury did not receive an interrogatory as to his negligence, if any.

12. Bark contends in his brief that he also attempted to cross-examine Woodcock, but the record indicates no such attempt at the time the settlement was announced. Bark's counsel did request cross-examination of parties to any agreement before trial began but accepted the statement of Woodcock's counsel that there had been no agreement.

Rule 408 [13] of the new Federal Rules of Evidence specifically states that while evidence of a compromise is not admissible to prove liability, "this rule does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness . . . ." Although the evidence rules did not formally become effective until July of 1975, several months after the trial in January, 1975, Rule 408 codifies a trend in case law that permits cross-examination concerning a settlement for the purpose of impeachment. 161 A.L.R. 395 (cases cited); Advisory Committee Notes to Rule 408; McCormick, *Evidence,* § 274 at 665 (2d ed. 1972).

As the Supreme Court has said, however, the "extent of cross-examination with respect to an appropriate subject of inquiry is within the sound discretion of the trial court." *Alford v. United States,* 1931, 282 U.S. 687, 694, 51 S.Ct. 218, 220, 75 L.Ed. 624, 629; *accord, United States v. Lawrance,* 5 Cir., 1974, 498 F.2d 1065, 1066; *Gordon v. United States,* 5 Cir., 1971, 438 F.2d 858, 865; *State Farm Fire & Casualty Co. v. McFerrin,* 5 Cir., 1967, 382 F.2d 282, 283, *cert. denied,* 1968, 390 U.S. 953, 88 S.Ct. 1045, 19 L.Ed.2d 1145. It is "fundamental that control of cross-examination rests in the discretion of the trial court and will be disturbed only when abused." *Burns v. Travelers Insurance Co.,* 5 Cir., 1965, 344 F.2d 70, 72.

█ In deciding whether to permit or limit cross-examination of a party, here Ms. Reichenbach, concerning a settle-

ment with a codefendant, the trial court must balance the policy of encouraging settlements with the need for evaluating the credibility of the witnesses. McCormick, *supra* at 665. We appreciate possible tensions created by these policies which Rule 408 now formally recognizes. The importance of informing the jurors fully so that they can carefully judge the credibility of each witness in making their fact determination may in some situations outweigh the desire to encourage settlements. But this choice must be made in the first instance by the trial judge.[14]

Here the trial court decided that the factfinding process would not be materially advanced by permitting cross-examination of the plaintiff about a trial-time settlement. Perhaps the trial judge concluded that the nature of the relationship between Ms. Reichenbach and Woodcock, her friend and escort which the jury knew full well, was sufficient in the jury's judging the credibility of her recitation of the facts of the collision. In addition, because the witness was also the plaintiff, her inherent interest in the outcome of the litigation may have been too manifest to require further proof through impeachment. *See Utica Mutual Insurance Co. v. Rollason,* 4 Cir., 1957, 246 F.2d 105, 111.

█ In this instance, aware of the broad discretion of the trial judge to run the trial, we are unable to find harmful error. F.R.Civ.P. 61; *see Tugwell v. A. F. Klaveness & Co.,* 5 Cir., 1963, 320 F.2d 866, 868, *cert. denied,* 1964, 376 U.S. 951,

---

**13.** *Rule 408. Compromise and Offers to Compromise*

Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require ex-

clusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.
Pub.L. 93–595, § 1, Jan. 2, 1975, 88 Stat. 1933.
Federal Rules, 1975 Edition (West Pub. Co. 1975).

**14.** Fed.R.Ev. 608(b) specifically gives the trial judge discretion to permit cross-examination, "if probative of truthfulness or untruthfulness," concerning specific instances of conduct of the witness.

84 S.Ct. 967, 11 L.Ed.2d 970. But we emphasize that this affirmance is not to be considered an approval for the future of the trial court's approach. The existence of a settlement agreement goes directly to the issue of credibility and usually the better approach is that codified in Rule 408.

Affirmed.