1999 ND 89

### SCHLOSSMAN & GUNKELMAN, INC., Plaintiff and Appellee,

v.

**Robert TALLMAN and Vincent Murphy, individually and doing business as M & T Investment Company, Defendants and Appellants.**

and

**Monte Kjos, individually and doing business as Kjos Investments, Defendant and Appellee.**

No. 980133.

Supreme Court of North Dakota.

May 19, 1999.

Steven A. Johnson, Vogel, Weir, Bye, Hunke & McCormick, Ltd., Fargo, ND, for plaintiff and appellee.

Stephen W. Plambeck, Nilles, Hansen & Davies, Ltd., Fargo, ND, for defendants and appellants.

Bruce H. Carlson, McNair, Larson & Carlson, Ltd., Fargo, ND, for defendant and appellee. Submitted on brief.

VANDE WALLE, Chief Justice.

[¶ 1] Robert Tallman and Vincent Murphy, individually and doing business as M & T Investment Company, appealed from a judgment awarding Schlossman & Gunkelman, Inc., a $103,432.21 commission, plus interest and costs, under a listing agreement for the Village Square Office and Warehouse in Fargo. We hold the trial court erred in ruling two letters written by Tallman were not offers of compromise under N.D.R.Evid. 408 and admitting them into evidence in the jury

trial. We reverse and remand for further proceedings.

I

[¶ 2] M & T is a partnership which owns commercial real estate, and, as relevant to this case, owned Village Square. Schlossman is a real estate firm engaged in selling and leasing commercial real estate. Michael Beaton is a real estate agent and part owner of Schlossman. Monte Kjos, doing business as Kjos Investments, is also a real estate agent. The ultimate issue in this case involves the agents' right to commissions under listing agreements for Village Square.

[¶ 3] On May 31, 1991, M & T and Schlossman, through Beaton, entered a written contract in which M & T agreed to employ Schlossman "exclusively" to rent, lease and sell Village Square from June 1, 1991, through May 31, 1993. The agreement required M & T to pay Schlossman a six percent commission for the sale or lease of the property if Schlossman found a buyer or tenant ready willing and able to buy or lease it during the period of the agreement or any renewal. In early June 1993, M & T and Schlossman executed a written extension of the listing agreement "in its entirety" through May 31, 1995.

[¶ 4] On June 24, 1993, however, M & T and Kjos executed a written contract in which M & T agreed to "exclusively employ" Kjos to sell Village Square. M & T extended Kjos's listing through April 1994, when it expired. According to Kjos, in March 1995, he talked with Murphy about relisting the property, and Murphy told Kjos that Schlossman's listing would expire on March 31, 1995. Kjos subsequently learned Schlossman's listing expired on May 31, 1995, and in June 1995, M & T and Kjos entered a written contract in which M & T again agreed to "exclusively employ" Kjos to sell Village Square. Meanwhile, on August 15, 1995, M & T and Schlossman entered another written extension of their June 1, 1991 listing agreement "in its entirety" through May 31, 1997.

[¶ 5] In late 1995, Kjos procured a buyer for Village Square. Beaton claimed he did not learn about Kjos's involvement with Village Square until December 20, 1995, when Beaton sent Tallman a fax updating Tallman on Beaton's efforts to sell the property, and Tallman responded that Kjos had procured a buyer for the property. M & T sold Village Square to Kjos's buyer for $1,200,000 on December 29, 1995, and paid Kjos a $52,000 commission.

[¶ 6] M & T refused to pay Schlossman a commission for the sale of Village Square. Schlossman sued M & T for a six percent commission for the sale and a six percent commission from lease payments made to M & T by DakTech, a Village Square tenant. Schlossman also sued Kjos for tortious interference with contract. M & T counterclaimed against Schlossman for breach of an agreement to manage Village Square, and cross-claimed against Kjos for breach of a fiduciary duty.

[¶ 7] The trial court decided the listing agreements were ambiguous and, among other things, instructed the jury to decide whether the agents had exclusive listing agreements for Village Square. The jury returned a special verdict finding: (1) both Schlossman and Kjos had "exclusive" listing agreements to sell Village Square; (2) Schlossman substantially performed its obligations under its listing agreement and was entitled to recover $23,300 for the sale of Village Square; (3) Schlossman was entitled to recover $10,366 as a commission from DakTech's lease payments; (4) Schlossman did not enter a management agreement with M & T for Village Square; and (5) Kjos did not intentionally interfere with Schlossman's contract with M & T, or breach a fiduciary duty to M & T.

[¶ 8] The trial court granted Schlossman judgment as a matter of law, concluding M & T was liable to Schlossman for $72,000, which represented a six percent commission from the sale of Village Square, and $31,434.21, which represented a six percent commission from DakTech's lease payments. The court denied M & T's motions for judgment as a matter of law, or for a new trial. A judgment awarding Schlossman the six percent commissions, plus interest and costs, was entered.

## II

[¶ 9] M & T argues two letters written by Tallman were offers of settlement under N.D.R.Evid. 408, and the trial court erred in admitting them into evidence.

### A

[¶ 10] Tallman's first letter, dated December 20, 1995, responded to Beaton's update about his efforts to sell Village Square. Tallman's letter informed Beaton that Kjos had sold the property and said, in part:

As for any commission due you on this matter, the mistake of having two listings was mine. I don't believe that [Kjos] owes you any commissions, but this will be up to you and [Kjos]. I will personally pay you for any out of pocket expenses.

[Murphy] and I have given you considerable business in the past and hope to do so in the future. We trust that you will take this into consideration in this matter.

[¶ 11] Tallman's second letter, dated January 16, 1996, responded to a letter from Schlossman's attorney and provided, in part:

Mr. Murphy and I (at my request from Mr. Murphy) engaged Mr. Beaton to rent and to try to sell the Village Square Building ... back in May of 1991.

Two years went by with no action at all. . . .

After two years of no activity we informed Mr. Beaton that we were going to try another realtor. At his request, we advised Mr. Beaton that he could continue to work on the property but would not under any circumstance have a[n] exclusive listing.

At that time we got Mr. Kjos into the act. We informed Mr. Kjos that he also did not have an exclusive listing and that we would consider any offer brought to us by either him or Mr. Beaton. Both Mr. Beaton and Mr. Kjos were and always have been fully aware of this condition and continued to work under this condition.

Another two years went by and in late November Mr. Kjos brought us an offer at our set price. It turned out that satisfactory financial arrangements could be made and we accepted the offer and sold the building in December of 1995.

. . . .

On 1/4/96 I called Mr. Beaton on the phone and told him that I would personally give him a check for $3,000 (plus an[y] out of pocket expenses for signs, etc.). Mr. Murphy was and is very much against this. Mr. Beaton told me on the phone that he would consider this offer and call me back. No call has been received and now we have your letter.

As Mr. Murphy points out, Mr. Beaton has nothing coming. In four years he brought us no prospects. He has been fully aware of two people working on the property for over two years.

As I pointed out previously, I've known Mr. Beaton since he was a boy and made him the $3,000 offer to reasonably pay him for whatever time he might have spent on this matter; which can't have been much as no offers or prospects ever surfaced.

[¶ 12] The trial court denied M & T's pretrial motion in limine to exclude the two letters, ruling they were not offers of settlement under N.D.R.Evid. 408. The court indicated it would consider redacting two paragraphs from the January 16, 1996 letter in which Tallman offered to pay Beaton $3,000, but deferred ruling on those redactions until that letter was offered into evidence. At trial, during direct examination of Beaton, the court admitted into evidence Tallman's December 20, 1995 letter, ruling it was not an offer of settlement under N.D.R.Evid. 408 and its prejudicial effect did not outweigh its probative value under N.D.R.Evid. 403. The court, however, redacted Tallman's statement "I will personally pay you for any out of pocket expenses," and also asked the parties to redact the two paragraphs in the January 1996 letter regarding Tallman's $3,000 offer to Beaton. Those two paragraphs were not redacted, and the court subsequently admitted the entire January 1996 letter into evidence during cross-examination of Tallman.

[¶ 13] M & T argues both letters were offers of settlement, and they were improperly used to prove liability under N.D.R.Evid. 408. M & T argues the trial court's refusal to exclude those letters "crippled" its case

from the outset. Schlossman and Kjos argue Tallman's December 20, 1995 letter was not an offer of settlement under N.D.R.Evid. 408, because there was not a "disputed" claim between the parties when it was sent. They also argue the court properly admitted both letters for "another purpose" under N.D.R.Evid. 408—to impeach M & T's evidence that it was dissatisfied with Schlossman's services and neither Schlossman nor Kjos had an "exclusive" listing agreement, and to impeach Tallman's testimony that he understood there was no such thing as an "exclusive" listing agreement and any real estate agent could sell listed property.

### B

[¶ 14] Rule 408, N.D.R.Evid., provides:

Evidence of (1) furnishing, offering, or promising to furnish, or (2) accepting, offering, or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for, invalidity of, or amount of the claim or any other claim. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. Exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations is not required. This rule does not require exclusion if the evidence is offered for another purpose, such as proving bias or prejudice of a witness, disproving a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

[¶ 15] Rule 408, N.D.R.Evid., furthers a well-recognized public policy encouraging out-of-court compromise and settlement of disputed claims to avoid costly and time-consuming litigation. N.D.R.Evid. 408, Explanatory Note. *See Reiger v. Wiedmer,* 531 N.W.2d 308, 311 (N.D.1995); *Thomas v. Stickland,* 500 N.W.2d 598, 600 (N.D.1993); *Zimprich v. North Dakota Harvestore Sys., Inc.,* 461 N.W.2d 425, 431 (N.D.1990). *Cf. Blackburn, Nickels & Smith, Inc. v. National Farmers Union Prop. & Cas. Co.,* 452 N.W.2d 319, 323 (N.D.1990) (stating public policy encourages settlement of lawsuits).

[¶ 16] Under N.D.R.Evid. 408, evidence of compromise or offers to compromise a disputed claim is not admissible to prove liability for, invalidity of, or the amount of a claim. Rule 408, N.D.R.Evid., encourages complete candor during settlement discussions by expanding the common-law rule and rendering inadmissible "[e]vidence of conduct or statements made in compromise negotiations." *See* N.D.R.Evid. 408, Explanatory Note. *Cf. Larson v. Quanrud, Brink & Reibold,* 78 N.D. 70, 80, 47 N.W.2d 743, 748 (1950) (holding admissions of independent facts during course of compromise negotiations admissible under common law). Under N.D.R.Evid. 408, if settlement evidence is offered to show liability for, invalidity of, or the amount of a disputed claim, exclusion of the evidence is the norm. *Thomas,* 500 N.W.2d at 600. Exclusion of settlement evidence is not required, however, if the evidence is offered for "another purpose, such as proving bias or prejudice of a witness, disproving a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution." N.D.R.Evid. 408. *See Reiger,* 531 N.W.2d at 311; *Thomas,* 500 N.W.2d at 601.

### C

[¶ 17] The exclusionary provisions of N.D.R.Evid. 408 apply to settlement evidence regarding "a claim which was disputed as to either validity or amount." In *Gangl v. Gangl,* 281 N.W.2d 574, 582 (N.D.1979), we applied a broad meaning to disputed claim, stating it requires a difference in interests and views between the parties and does not require the actual filing of a lawsuit. Federal authorities [1] also recognize a claim is disputed if there is a difference in interests or views which the parties are attempting to resolve through compromise negotiations or offers to settle. *See Affiliated Mfrs., Inc. v. Aluminum Co.,* 56 F.3d 521, 526 (3rd Cir. 1995). *See generally* 2 Jack B. Weinstein &

---

1. Our rule is derived from the corresponding federal rule, *Thomas,* 500 N.W.2d at 600, and in construing our rule, we may consider persuasive authority construing the federal rule. *See Keyes v. Amundson,* 343 N.W.2d 78, 85 (N.D.1983).

Margaret A. Berger, *Weinstein's Federal Evidence* § 408.06 (2nd Ed.1999); 2 Christopher B. Mueller and Laird C. Kirkpatrick, *Federal Evidence* § 136 (2nd Ed.1994). Under F.R.Evid. 408, the parties' intent controls whether there is a difference in interests or views which the parties are attempting to resolve through an offer to settle. *See Kritikos v. Palmer Johnson, Inc.*, 821 F.2d 418, 423 (7th Cir.1987); *Ramada Dev. Co. v. Rauch*, 644 F.2d 1097, 1106 (5th Cir.1981). *See generally* 2 *Weinstein's Federal Evidence* at § 408.03[2]; 2 *Federal Evidence* at § 136. Whether or not there is a "disputed" claim is a preliminary question for the court under F.R.Evid. 104. *See* 2 *Weinstein's Federal Evidence* at § 408.02[2]; 2 *Federal Evidence* at § 136.

[¶ 18] Here, the trial court denied M & T's pretrial motion in limine to exclude both letters, ruling they were not offers of settlement under N.D.R.Evid. 408. At trial, during direct examination of Beaton, the court admitted into evidence Tallman's December 20, 1995 letter, ruling it was not an offer of settlement under N.D.R.Evid. 408 and its prejudicial effect did not outweigh its probative value under N.D.R.Evid. 403.

■ [¶ 19] Tallman's December 20, 1995 letter identified a potential question regarding Beaton's commission and offered to "personally pay [him] for any out of pocket expenses," while emphasizing the parties' past and future business relationship as a "consideration in this matter." When Tallman sent the December 1995 letter, he may not have known any issues regarding the commission would escalate into a full-blown dispute. The tenor of Tallman's letter, however, contemplated a potential and imminent difference of opinion about the commission and sought a disposition that would prevent a full-scale controversy about the commission. Tallman's letter manifested his intent to avert a potential dispute, including possible litigation, with an offer to personally pay Beaton for any out of pocket expenses. We conclude, as a matter of law, Tallman's December 1995 letter constituted an offer of settlement under N.D.R.Evid. 408.[2]

[¶ 20] The trial court ruled both letters were not offers of settlement under N.D.R.Evid. 408, and decided the prejudicial effect of the letters did not outweigh their probative value under N.D.R.Evid. 403. As we conclude later, the court's exercise of discretion under N.D.R.Evid. 403 was influenced by its misconception the letters were not offers of compromise; however, because a court's decision to admit settlement evidence for another purpose is discretionary, we consider the court's ruling in the context of the admissibility of the letters for another purpose.

**D**

[¶ 21] We have recognized settlement evidence is admissible for purposes other than to prove liability for, invalidity of, or the amount of a disputed claim, but we have not described the contours of those other purposes. *Reiger*, 531 N.W.2d at 311; *Thomas*, 500 N.W.2d at 601. In *Reiger* at 311, we held evidence of allegedly misleading statements by the defendants' insurance adjuster was admissible to explain why the defendants were estopped from pleading the statute of limitations as an affirmative defense to a tort claim. In *Thomas* at 601, we held a trial court erred in admitting evidence of a plaintiff's settlement with a third person, because the settlement clearly was introduced to prove the defendants' lack of liability for the plaintiff's claim, rather than to show bias or prejudice. We held, however, the error was harmless, because, in view of other ample evidence about the accident, we discerned no possible prejudice to the plaintiff. *Id.* at 601–02.

[¶ 22] Under F.R.Evid. 408, settlement evidence is not automatically admissible when offered for "another purpose." *See United States Aviation Underwriters v. Olympia Wings, Inc.*, 896 F.2d 949, 956 (5th Cir.1990); *Williams v. Chevron U.S.A., Inc.*, 875 F.2d 501, 505 (5th Cir.1989); *McInnis v. A.M.F.,*

2. Schlossman and Kjos have not argued Tallman's January 16, 1996 letter was not an offer of settlement under N.D.R.Evid. 408. Tallman's January 1996 letter responded to threatened litigation by Schlossman's attorney and included evidence of an offer of settlement within the meaning of N.D.R.Evid. 408.

*Inc.*, 765 F.2d 240, 250–51 (1st Cir.1985); *Belton v. Fibreboard Corp.*, 724 F.2d 500, 505 (5th Cir.1984); *Ramada*, 644 F.2d at 1107; *Reichenbach v. Smith*, 528 F.2d 1072, 1075 (5th Cir.1976). *See generally* 2 *Weinstein's Federal Evidence* at § 408.08[1]; 2 *Federal Evidence* at § 138; 1 Stephen A. Saltzburg, Michael M. Martin, & Daniel J. Capra, *Federal Rules of Evidence Manual*, Rule 408, pp. 603–04 (7th Ed.1998).

■ [¶ 23] In deciding whether to admit settlement evidence for another purpose, a trial court must carefully exercise its discretion and balance the probative value of the evidence for a permissible purpose against the prejudicial effect and risk the evidence will be used for an improper purpose. *See Freidus v. First Nat'l Bank*, 928 F.2d 793, 795 (8th Cir.1991); *United States Aviation*, 896 F.2d at 956; *Chevron*, 875 F.2d at 505; *Brocklesby v. United States*, 767 F.2d 1288, 1292–93 (9th Cir.1985); *Belton*, 724 F.2d at 505; *Ramada*, 644 F.2d at 1107; *John McShain, Inc. v. Cessna Aircraft Co.*, 563 F.2d 632, 633–34 (3rd Cir.1977); *Reichenbach*, 528 F.2d at 1075. *See generally* 2 *Weinstein's Federal Evidence* at § 408.08[1]; 2 *Federal Evidence* at § 138; 1 *Federal Rules of Evidence Manual* at 603–04.

■ [¶ 24] Federal courts generally recognize the exception authorizing admission of settlement evidence for "another purpose" permits the introduction of settlement evidence to impeach a witness's credibility. *See Brocklesby*, 767 F.2d at 1292–93; *County of Hennepin v. AFG Industries*, 726 F.2d 149, 152–53 (8th Cir.1984); *John McShain*, 563 F.2d at 633–34; *Reichenbach*, 528 F.2d at 1075. *See generally* 2 *Weinstein's Federal Evidence* at § 408.08[3]; 2 *Federal Evidence* at § 138; 1 *Federal Rules of Evidence Manual*, at pp. 602–03. *See also Missouri Pac. R.R. Co. v. Arkansas Sheriff's Boys' Ranch*, 280 Ark. 53, 655 S.W.2d 389, 394–95 (1983) (construing Arkansas rule); *Davidson v. Beco Corp.*, 114 Idaho 107, 753 P.2d 1253, 1255 (1987) (construing Idaho rule); *El Paso Elec. Co. v. Real Estate Mart, Inc.*, 98 N.M. 570, 651 P.2d 105, 108–09 (Ct.App.1982) (construing New Mexico rule). A court considering the admissibility of settlement evidence for impeachment purposes must reconcile the tension between two important public policies: encouraging open and frank discussions during settlement negotiations and accommodating the truth-finding process through the evaluation of a witness's credibility. *See Ramada*, 644 F.2d at 1107; *John McShain*, 563 F.2d at 635; *Reichenbach*, 528 F.2d at 1075.

■ [¶ 25] When the witness sought to be impeached is also a litigant, the admissibility of statements made during settlement negotiations increases the risk a jury may use the evidence substantively as an admission of liability. *See* 2 *Weinstein's Federal Evidence* at § 408.08[1]; 1 *Federal Rules of Evidence Manual* at p. 603. If issues directly bearing on liability are intertwined with impeachment issues, a trial court's balancing must insure the evidence is not camouflaged to establish liability, *see McInnis*, 765 F.2d at 250–51, or will not unduly prejudice or confuse a jury. *See Chevron*, 875 F.2d at 505; *Belton*, 724 F.2d at 505. Some federal courts have suggested the better practice in doubtful cases is to exclude settlement evidence offered for another purpose. *Bradbury v. Phillips Petroleum Co.*, 815 F.2d 1356, 1364 (10th Cir.1987). *See Equal Employment Opportunity Comm'n v. Gear*, 948 F.2d 1542, 1546 (10th Cir.1991). If evidence from settlement negotiations is admitted, however, the court should instruct the jury regarding its limited admissibility. *See Brocklesby*, 767 F.2d at 1292–93; *El Paso Elec.*, 651 P.2d at 108–9. *See generally* 2 *Weinstein's Federal Evidence* at § 408.10[2]. *See also* N.D.R.Evid. 105.

■ [¶ 26] Under F.R.Evid. 408 and 403, a trial court considering the admissibility of settlement evidence for impeachment purposes must carefully balance the probative value of the evidence against the danger it will be used for an improper purpose within the context of the policies encouraging open and frank discussions during settlement negotiations and fostering the truth-finding process through the evaluation of a witness's credibility. *See Chevron*, 875 F.2d at 505; *Brocklesby*, 767 F.2d at 1292–93; *Belton*, 724 F.2d at 505; *Ramada*, 644 F.2d at 1107; *John McShain*, 563 F.2d at 633–34; *Reichenbach*, 528 F.2d at 1075. *See generally* 2

*Weinstein's Federal Evidence* at § 408.08[1]; 1 *Federal Rules Manual* 408 at 603–04. The court's decision to admit or exclude settlement evidence offered for another purpose is discretionary, *see Thomas*, 500 N.W.2d at 600, and a court abuses its discretion if its decision is arbitrary, unreasonable, or unconscionable, or if it misinterprets or misapplies the law. *Jorgenson v. Ratajczak*, 1999 ND 65, ¶ 17, 592 N.W.2d 527.

[¶ 27] Here, the trial court's decision the prejudicial effect of the letters did not outweigh their probative value was influenced by its initial misconception the letters were not evidence of offers of compromise under N.D.R.Evid. 408. Moreover, the court admitted Tallman's December 20, 1995 letter during direct examination of Beaton, Schlossman's first witness, which belies any claim the letter was used solely for impeachment and suggests the letter was used for a substantive purpose. *See Missouri Pac. R.R. Co.*, 655 S.W.2d at 394–95 (suggesting statements during settlement negotiations inadmissible during case-in-chief, but admissible to impeach defendant's testimony). We also note there was no limiting instruction on the use of the letters. *See* N.D.R.Evid. 105 (stating "[w]henever evidence which is admissible ... for one purpose but not admissible ... for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly").

[¶ 28] We conclude the trial court erred in ruling the two letters were not evidence of offers of settlement under N.D.R.Evid. 408, and the court's exercise of discretion in admitting the letters into evidence under N.D.R.Evid. 403 was influenced by its misconception the letters were not evidence of offers of settlement.

[¶ 29] Schlossman and Kjos claim any error in admitting the letters was harmless, because other settlement evidence was admitted without objection during trial. We refuse to second guess M & T's trial tactics after the court's ruling on the pretrial motion in limine. *See Thomas*, 500 N.W.2d at 601

(stating once trial court ruled settlement evidence was admissible, party had no choice but to present case in accordance with ruling). We decline to conclude the two letters did not have a substantial and prejudicial effect on the outcome of this trial. We hold the error was not harmless, and we remand for proceedings consistent with this opinion. On remand, if the parties seek to introduce the letters for another purpose, the court must apply the appropriate balancing under N.D.R.Evid. 408 and 403 in ruling on the admissibility of the letters.

### III

[¶ 30] Although our disposition of the evidentiary issue is dispositive of this appeal, we also consider issues likely to arise on remand. *See Dosland v. Netland*, 424 N.W.2d 141, 142 (N.D.1988). M & T argues the trial court erred in instructing the jury on a real estate agent's fiduciary duty and on unilateral contract. We review jury instructions as a whole and if, as a whole, they correctly advise the jury of the law, they are sufficient although parts of them, standing alone, may be erroneous and insufficient. *Olson v. Griggs Cty.*, 491 N.W.2d 725, 729 (N.D.1992). Although parties are entitled to instructions on their theory of the case, a trial court need not give instructions in the specific language requested by a party if the instructions given, as a whole, fairly inform the jury of the law. *Spieker v. Westgo, Inc.*, 479 N.W.2d 837, 844 (N.D.1992).

### A

[¶ 31] The trial court's instruction on fiduciary duty provided, in part:

A realtor is a fiduciary for the client, holding a position of trust and confidence, and must exercise the utmost good faith and loyalty in the performance of the duties arising from matters within the scope of the realtor's employment. A realtor, therefore, has a duty to use reasonable care, skill and diligence in performing the obligations owed to the client.[3]

---

3. The trial court used "realtor" when it no doubt meant "real estate agent." " 'Realtor' is a federally registered collective membership mark owned by the National Association of Realtors and properly used only in reference to members

[¶ 32] M & T argues the court's instruction "failed to explain specifically what legal duties arose from the fiduciary relationship, that the duties included an obligation to disclose all material facts and other matters that might affect the transaction, and an obligation to refrain from acting adversely to the client's interest . . . [, and] that a realtor loses the commission for breaching a fiduciary duty."

[¶ 33] M & T's requested instruction specifically defined fiduciary duty[4] to include the duty to disclose material facts and refrain from acting adversely to the client, and to preclude the agent from recovering a commission for its breach. The trial court's instruction, however, advised the jury of a real estate agent's fiduciary duty to "exercise the utmost good faith and loyalty in the performance of the duties arising from matters within the scope of the realtor's employment" and to "use reasonable care, skill and diligence in performing the obligations owed to the client." That instruction clearly would preclude an agent's self dealing, taking action adverse to the client and fraudulent conduct. The court's instruction did not preclude M & T from arguing Beaton and Kjos violated their fiduciary duty by failing to disclose material facts and refraining from acting adversely to M & T's interests. Moreover, the special verdict instructed the jury not to answer questions on commissions if it found a breach of a fiduciary duty. We hold the trial court's instruction on fiduciary duty, when read as a whole, fairly and adequately advised the jury of the law. The court did not err in refusing to instruct the jury in the specific language requested by M & T.

B

[¶ 34] M & T argues the trial court erred in instructing the jury on a real estate agent's duty to perform under a unilateral contract. The court instructed the jury that if Schlossman had an exclusive right to sell or lease Village Square, Schlossman was entitled to a commission if it substantially performed the duties of a real estate agent. The court defined "substantial performance" to mean "the expenditure of time, money, and effort."

[¶ 35] Relying on *City of Granville v. Kovash*, 118 N.W.2d 354, 358 (N.D.1962), M & T asked the court to instruct the jury that substantial performance meant the real estate agent "in good faith, undertook to perform the important parts of the contract." In *Kovash* at 357, the issue was whether a contractor had substantially performed a construction contract to install water lines seven and one-half feet below the ground. We said substantial performance in that context meant the contractor endeavored in good faith to perform every important part of the contract, except unimportant and unintentional omissions or deviations. *Id.* at 358.

[¶ 36] In *Bismarck Realty Co. v. Folden*, 354 N.W.2d 636, 639–41 (N.D.1984), however, we considered an issue involving a similar ambiguous listing agreement and a non-selling real estate agent's right to a commission. We concluded the trial court did not err in characterizing the parties' listing agreement as a form of an exclusive right to sell, which forbid the owners from selling property themselves or through another broker while the property was listed with the original broker. *Id.* at 640–41. We also concluded the original broker was entitled to damages based on the commission stated in the contract if the broker substantially performed the contract through the expenditure of time, effort, or money in marketing the property. *Id.* at 641. *See also Kruger v. Soreide*, 246 N.W.2d 764, 773 (N.D.1976) (stating broker with exclusive right to sell property must

of the association." Black's Law Dictionary 1264 (6th ed.1990).

4. M & T requested the following instruction on fiduciary duty, which provided, in part:
A real estate agent's fiduciary duty includes a duty to disclose all material facts, including all matters known to the real estate agent which might affect the transaction. A real estate agent is prohibited from advancing any personal interest in a manner which would be adverse to the interest of the client. A real estate agent must also refrain from acting adversely to the client's interest and avoid engaging in any fraudulent conduct.
A real estate agent who breaches a fiduciary duty is not entitled to a commission.

present evidence of expenditure of time, effort, or money to recover commission).

[¶ 37] In the context of a claim for a real estate commission, a real estate agent who has an exclusive listing and substantially performs is entitled to a commission. *Folden*, 354 N.W.2d at 641. In that context, substantial performance means the expenditure of time, effort, or money. *Id.* The trial court's instruction correctly advised the jury on the elements of substantial performance necessary for a real estate broker with an exclusive listing to earn a commission.

## IV

[¶ 38] We reverse the judgment and remand for proceedings consistent with this opinion.[5]

[¶ 39] SANDSTROM, NEUMANN, MARING, and KAPSNER, JJ., concur.

---

5. M & T also argues the trial court erred in awarding Schlossman a full six percent commission for the sale of Village Square and for Dak-Tech's leases. Because that issue may not arise on remand, we decline to consider it.