# IN THE SUPREME COURT
# STATE OF NORTH DAKOTA

## 2025 ND 47

Bruce Higgins, Rebekka Higgins,

Estate of Judy Devney, dec'd, and John L. Devney,                Plaintiffs and Appellees

v.

Maynard Lund, Kjersti Eide, Don Eide, and

Jennifer Eide,                Defendants and Appellants

and

XTO Energy, Inc., Continental Resources, Inc.,

and Whiting Petroleum, Corp.,                Defendants and Appellees

### No. 20240083

Appeal from the District Court of Williams County, Northwest Judicial District, the Honorable Charles B. Neff, Jr., Judge.

AFFIRMED.

Opinion of the Court by Jensen, Chief Justice, in which Justices Crothers, McEvers, Tufte, and Bahr joined. Justice Crothers filed an opinion specially concurring.

Joshua A. Swanson, Fargo, ND, for plaintiffs and appellees Bruce Higgins and Rebekka Higgins.

Greg W. Hennessy, Williston, ND, for plaintiffs and appellees Estate of Judy Devney and John L. Devney.

Bryan L. Van Grinsven, Minot, ND, for defendants and appellants.

Zachary E. Pelham (appeared), Spencer D. Ptacek (appeared), Lawrence Bender (on brief), Bismarck, ND, for defendants and appellees.

**Jensen, Chief Justice.**

[¶1] Maynard Lund, Kjersti Eide, Don Eide, and Jennifer Eide ("Lund-Eide Appellants") appeal from a district court's final judgment, and its various preliminary orders and partial judgments. The Lund-Eide Appellants assert the following: (1) the court's interpretation of the 1964 warranty deed was erroneous, (2) the court's determination that the parties did not stipulate to an interpretation of the 1952 royalty deed was erroneous, and (3) the court's final order and final judgment, determining a division of the suspended oil and gas proceeds based upon the court's interpretation of the 1964 warranty deed and 1952 royalty deed, was erroneous. We conclude the court did not err in the interpretation of the deeds or in determining a division of the suspended oil and gas proceeds. The judgment of the court is affirmed.

I

[¶2] In January 2017, Bruce Higgins, Rebekka Higgins, the Estate of Judy Devney, and John. L. Devney ("Higgins-Devney Appellees") sought a judgment quieting title to mineral interests in Williams County and the recovery of its oil and gas proceeds. The Lund-Eide Appellants denied the allegations and asserted counterclaims, seeking quiet title to the mineral interests as well. XTO Energy, Inc., Continental Resources, Inc., and Whiting Petroleum, Corp. ("Joint Appellees") asked the district court to dismiss the complaint.

[¶3] In April 2018, a bench trial was held to determine the interpretation of a 1964 warranty deed. The district court heard testimony from Phil Jore, Bruce Higgins, Jessica Eide, and Kjersti Eide. In August 2018, the court issued findings of fact, conclusions of law, and an order for judgment. The court held that the reservation in the 1964 warranty deed reserved to Milton Higgins his entire interest in and under the top parcel of the deed. The court quieted title in the top parcel, "result[ing] in the co-equal 50/50 split of the partnership mineral acres of the original ranch partners Milton Higgins and Howard Lund applying to the successor parties as Milton [Higgins] intended." The court awarded the Higgins-

Devney Appellees $237,000 for "royalty damages," plus fees and costs. The court also held that the 1952 royalty deed had "been stipulated to by all parties, with only Whiting declining to comment."

[¶4] In May 2021, John Devney moved for summary judgment, arguing the 1952 royalty deed conveyed a floating royalty. Bruce Higgins also moved for summary judgment, asserting the same argument as John Devney. The Lund-Eide Appellants responded by arguing the parties had stipulated to an interpretation of the 1952 royalty deed during the 2018 trial. The Joint Appellees did not take any position in response to the motions for summary judgment.

[¶5] In October 2021, the district court granted the Higgins-Devney Appellees' motions for summary judgment. The court determined there was not a valid stipulation, and the 1952 royalty deed conveyed a floating royalty rather than a fixed royalty. Judgment was entered in December 2021.

[¶6] Based upon the district court's interpretation of the 1964 warranty deed and 1952 royalty deed, the distribution of suspended royalties was calculated. In October 2023, the court entered an order adopting calculations of decimal ownership interests of the parties. In January 2024, the court entered a final judgment.

II

[¶7] The Devney Appellees argue this Court lacks jurisdiction because the appeal by the Lund-Eide Appellants was untimely. Under N.D.R.App.P. 4(a)(1), "the notice of appeal required by Rule 3 must be filed with the clerk of the supreme court within 60 days from service of notice of entry of the judgment or order being appealed." This time limit is "mandatory and jurisdictional." *Farmers Union Grain Terminal Ass'n v. Briese*, 192 N.W.2d 170, 173 (N.D. 1971). "Where an appeal has not been taken within the statutory period, this [C]ourt is without power to do more than dismiss the appeal" because it lacks jurisdiction. *Id.*; *Atkins v. State*, 2021 ND 34, ¶ 9, 955 N.W.2d 109. "[T]ime for civil appeals runs from the date of service of notice of entry of the judgment or order . . . ." *Viscito v. Christianson*, 2015 ND 97, ¶ 7, 862 N.W.2d 777.

2

[¶8]   A final judgment, or the equivalent under N.D.R.Civ.P. 54(b), is necessary for appealability. *Wells Cnty. Water Res. Dist. v. Solberg,* 434 N.W.2d 577, 578 (N.D. 1989). An order, which is complete, final, and does not anticipate or direct further action, is appealable. *See Buchholz v. Barnes Cnty. Water Bd.*, 2008 ND 158, ¶ 7, 755 N.W.2d 472. However, N.D.R.Civ.P. 54(b) states the following:

> If an action presents more than one claim for relief, whether as a claim, counterclaim, crossclaim, or third-party claim, or if multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay. Otherwise, any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

*See, e.g., Barth v. Schmidt*, 472 N.W.2d 473, 474-75 (N.D. 1991) ("When there are claims remaining to be decided in the trial court, an appeal will not normally be considered for jurisdictional reasons."). This Court has a longstanding policy against piecemeal appeals. *Sime v. Tvenge Assocs. Architects & Planners*, 488 N.W.2d 606, 608 (N.D. 1992).

[¶9]   The notice of entry of judgment for the 2018 trial, which interpreted the 1964 warranty deed, was served on March 28, 2019. However, before the 2018 trial, the parties agreed to proceed in a "multi-step approach": the district court must first resolve the 1964 warranty deed issue, then the court will resolve the distribution of suspended royalties. The notice of entry of judgment in regard to the 1952 royalty deed was served on December 13, 2021. In the December 13, 2021 judgment, the court acknowledged that the two previous judgments were not final judgments. ("This bifurcated action came on for its first bench trial in April 2018 . . . .").

[¶10]  The judgments served on March 28, 2019 and December 13, 2021 were not final judgments because they anticipated further action. *See Morales v. Weatherford U.S.*, 2024 ND 81, ¶¶ 11-33, 6 N.W.3d 657; *Buchholz,* 2008 ND 158,

3

¶ 7. In neither of those two judgments did the district court "direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay." N.D.R.Civ.P. 54(b). Nor did the judgments adjudicate all of the claims. *See id*. Consequently, those judgments were not appealable.

[¶11] The notice of entry of a subsequent judgment was served on the parties on January 12, 2024. In this judgment, the district court stated: "[t]his judgment disposes of all claims, counterclaims, crossclaims, and issues raised in the above-captioned action, and is intended by the Court to be final." This judgment adjudicated all of the claims and did "not anticipate or direct further action," and was appealable. *See, e.g., Buchholz*, 2008 ND 158, ¶ 7; N.D.R.Civ.P. 54(b).

[¶12] The Lund-Eide Appellants filed their notice of appeal with the clerk of the supreme court on March 12, 2024, which was on the last day of the 60-day filing window from the service of the notice of entry of judgment on January 12, 2024. Therefore, the Lund-Eide Appellants' appeal was timely, and this Court has jurisdiction.

III

[¶13] The Lund-Eide Appellants argue the district court's interpretation of the 1964 warranty deed was erroneous. A court's primary goal in interpreting a contract is to ascertain the intentions of the contracting parties at the time of contracting. *Kaler v. Kraemer*, 1999 ND 237, ¶ 13, 603 N.W.2d 698. When interpreting a contract, N.D.C.C. § 9-07-06 provides that "[t]he whole of a contract is to be taken together so as to give effect to every part if reasonably practicable." Accordingly, each clause, sentence, and provision of the 1964 warranty deed must be given effect to determine the contracting parties' intent, and to interpret and enforce it in its entirety. *See Egeland v. Cont'l Res., Inc.*, 2000 ND 169, ¶ 10, 616 N.W.2d 861. "Grants in a contract are interpreted in favor of the grantee, except a reservation in any grant is interpreted in favor of the grantor. If the parties' intent can be ascertained from the writing alone, the interpretation of the contract is entirely a question of law . . . ." *U.S. Bank v. Koenig*, 2002 ND 137, ¶ 8, 650 N.W.2d 820 (cleaned up).

4

[¶14] However, if a deed is ambiguous, extrinsic evidence may be considered to determine the parties' intent, and the contract terms and the parties' intent become questions of fact. *Border Res., LLC, v. Irish Oil & Gas, Inc.*, 2015 ND 238, ¶ 15, 869 N.W.2d 758. A deed is ambiguous if rational arguments as to the meaning of terms, phrases or clauses can be made in support of contrary positions. *See, e.g., EOG Resources, Inc. v. Soo Line R. Co.*, 2015 ND 187, ¶ 15, 867 N.W.2d 308; *Sargent Cnty. Water Res. Dist. v. Mathews*, 2015 ND 277, ¶ 6, 871 N.W.2d 608.

[¶15] The 1964 warranty deed at issue granted Howard Lund, Maude Lund, Donald Eide, and Marlene Eide an "undivided one half (1/2) interest in the following lands" [("Top Parcel")]:

Township 155 [North], Range 97 [West]
Section 32:  E½SE¼,
Section 33:  S½,
Section 34:  SW¼, and

Township 154 [North], Range 97 [West]
Section 4:  Lots 1, 2, 3 and 4, S½NW¼, SW¼, W½SE¼,
Section 5:  Lot 1, SE¼NE¼, E½SE¼,
Section 9:  E½, and
Section 10:  SW¼NW¼, NW¼SW¼, and

Complete title in the following lands [("Bottom Parcel")]:

Township 154 [North], Range 97 [West]
Section 5:  SW¼SE¼, S½SW¼,
Section 6:  Lots 3, 4 and 5, SE¼NW¼, SW¼NE¼, W½SE¼, SE¼SE¼,
Section 7:  N½NE¼, SW¼NE¼,
Section 8:  NE¼, N½NW¼, SE¼NW¼, E½SE¼, NW¼SE¼,
Section 9:  W½,
Section 17:  E½E½,
Section 14:  SE¼NW¼, SW¼NE¼, NW¼SE¼, N½NE¼SW¼, and tract of land bounded as follows: Beginning at a point which is 330' east of the northwest corner of the SW¼SE¼, thence due east 990', thence due south 990', thence in a northwesterly direction to the point of

5

> beginning, situate in the said SW¼SE¼, containing
> 11.25 acres, more or less,
>
> less one half of all oil, gas and all other fluid materials not heretofore
> conveyed, of record, which are hereby reserved to the grantors.

[¶16] The Lund-Eide Appellants argue the reservation clause in the 1964 warranty deed only applied to the bottom parcel, not the top parcel, because the deed describes the two parcels as separate and distinct parcels in order to convey a different quantum of interest. The Higgins-Devney Appellees argue the reservation clause in the 1964 warranty deed applied to both the top and bottom parcels because the plain language of the granting clause and the placement of the reservation support the conclusion that the parties intended that the grantees would not acquire Milton Higgins' reserved interest in the minerals under the top parcel. Rational arguments as to the meaning and effect of the reservation clause were made by both parties. Accordingly, we conclude the 1964 warranty deed is ambiguous, allowing for the consideration of extrinsic evidence to determine the parties' intent. The resolution of the parties' intent is therefore a question of fact subject to a clearly erroneous standard of review. A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if no evidence supports it, or if, on the entire evidence we are left with a definite and firm conviction a mistake has been made. *Schultz v. Schultz*, 2018 ND 259, ¶ 11, 920 N.W.2d 483.

[¶17] Before the 1964 warranty deed was executed, a 50% interest in the top parcel's minerals were conveyed to a third party. As a result, Milton Higgins and Howard Lund collectively owned, via partnership, an undivided 50% interest in the top parcel's surface and minerals. The bottom parcel was solely owned by Milton Higgins. To determine whether or not the reservation clause in the 1964 warranty deed applied to both the top and bottom parcels, the district court relied on the testimony and exhibits presented at the 2018 trial to ascertain the intent of the parties at the time the deed was executed.

[¶18] Bruce Higgins testified as follows in regard to the 1964 warranty deed:

> The '64 deed—I don't know what motivated it. I can only guess. My father was at retirement age, though he never officially retired. I

6

think he had—was dealing with so many balls in the air at that time that he simply decided the best thing to do would be to get out of the cattle and haying business with Howard [Lund]. And therefore, in the 1964 [warranty] deed, he gave up all of his interests in both the parcels that he and Howard [Lund] shared. But, also my father's own surface acres. And simply conveyed them to Howard [Lund] to say, this is yours. But, still wanted to retain the fact that the family shared equally in all oil and gas rights. Including oil and gas that Howard [Lund] had never owned.

. . . .

That is correct; he's basically, releasing—dad's releasing his ownership in all the surface acres for grazing, haying, whatnot; turning it over to Howard [Lund]. And also maintaining his half interest in oil and gas either in parcels that he and Howard [Lund] jointly shared, or in parcels that Howard [Lund]—or that my father, Milton [Higgins], had by himself.

. . . .

Every other person or source that I've looked at tells me that—that reservation applied to the entire deed, top to bottom.

. . . .

[A] reservation applies to what is called, "the four corners of the deed."

[¶19] Furthermore, in a letter to the IRS in 1972, Milton Higgins believed that he held about 1,000 mineral acres. If true, Bruce Higgins explained:

And then, there was that ambiguous part in the top half of the 1964 [warranty] deed. And I computed that two ways. How many mineral acres did dad retain if he only had one fourth share, in comparison with Howard[ Lund]'s three fourths. How many mineral acres my father would have had if he had retained his full half share and Howard [Lund] retained his full half share.

Now, keep in mind, of course, they only had fifty percent as I think's been brought out in this court because they both conveyed 50 percent of the oil and gas to Mr. Kornrumpf back in 1951. So, when I talk about shares, I'm talking, basically, between those parties. Three-fourths of a quarter or one half of a one half. Bottom line was this, I added up the figures and the only way that my father could have been anywhere near 1,000 mineral acres was if—it would have

7

been if he retained his full half share of the oil and gas in the top half of that 1964 [warranty] deed.

As a result, he ultimately interpreted Milton Higgins' reservation to be of his entire interest in the top parcel because of the 1972 letter to the IRS, past conveyances, and the fact that Milton Higgins "conveyed half of an interest[] in oil and gas that Howard [Lund] never owned[.]"

[¶20] Applying the reservation clause to both the top and bottom parcels of the 1964 warranty deed, the district court found that Milton Higgins "reserved all of his net undivided 50% partnership share of all oil and gas in [the Top Parcel] (the partnership land) as a matter of fact and law, and provided a co-equal 50% share of partnership minerals to Howard Lund." The court held the following:

> The Court hereby grants all the legal and equitable relief prayed for by plaintiffs Higgins/Devney recited in the complaint, which quieting of title in Bruce Higgins and the Judith Lee Devney Family Trust, John L. Devney III, trustee and John L. Devney III, individually, ½ of ½ of all Tract 1 oil, gas and minerals, to Tract 1 of the 1964 [warranty] deed, will result in the co-equal 50/50 split of the Tract 1 partnership mineral acres of the original ranch partners Milton Higgins and Howard Lund applying to the successor parties as Milton [Higgins] intended by the 1964 [warranty] deed.

[¶21] The district court supported its findings with reference to section 3-08 of the North Dakota Mineral Title Standards ("NDMTS"), noting the language of the 1964 warranty deed was an exact match to one of the examples in § 3-08. Specifically, because the words "undivided one half (1/2) interest in the following lands" were in front of the legal description, the court reasoned NDMTS § 3-08 dictated that Milton Higgins reserved 50% of all the partnership-owned oil and gas. Section 3-08 of NDMTS reads as follows:

> RESERVATIONS IN DEEDS CONVEYING LESS THAN 100 PERCENT OF THE SURFACE ESTATE 3-08
>
> Standard: (a) If a reservation in a conveyance refers to the land itself rather than to the granted interest therein, the fractional mineral

8

interest reserved should be construed as that portion of the entire mineral estate.

(b) If the granting clause describes the land as being an undivided interest in the land and a subsequent reservation which reserves a fractional part of the "land conveyed" or "land described and conveyed," or words of similar import, the reservation will be construed as reserving to the grantor the stated fractional interest of the fraction described in the granting clause.

Comment: This standard is derived in substantial part from 1 Kuntz, *The Law of Oil and Gas* § 14.5 at 420. The following example illustrates subsection (a):

> R owns the surface and an undivided 50 percent of the minerals on the land. R executes a general warranty deed as follows:
>
>> Grants . . . an undivided one-half interest . . . in the following described land: Section 6 etc. but there is reserved to the grantor, his heirs and assigns, an undivided one-fourth interest in the minerals in and under said tract.
>
> R reserves one-fourth of 100 percent, not one-fourth of one-half of 100 percent, on the rationale the reservation refers to the land itself (Section 6). 1 Williams and Meyers, *Oil and Gas Law*, section 312.

A contrary result would be reached where:

> R executes a warranty deed as follows: "Grants . . . the following described land 'an undivided one-half interest in Section 6, etc.' but there is reserved to the grantor, his heirs and assigns, an undivided one-fourth interest in the minerals in and under said land."

Here, the reservation refers to the land granted (there is reserved a ¼ interest in ½ of Section 6). Thus, R has reserved a 1/8 mineral interest in the tract (¼ x ½ = 1/8), and not an undivided one-fourth interest. 1 Williams and Meyers, *Oil and Gas Law* § 312.

[¶22] In the 1964 warranty deed, the reservation clause was subsequent to the granting clauses of the deed, in which one of the clauses granted "[a]n undivided one half (1/2) interest" in the top parcel. In the reservation clause, the grantors reserved for themselves "less one half of all oil, gas[,] and all other fluid minerals not heretofore conveyed . . . ." The phrase "not heretofore conveyed" is a "word[] of similar import" because it refers to the land not previously conveyed, and not the land itself. Because of its similarities to NDMTS § 3-08(b), we take guidance from the standard and construe the reservation as reserving to the grantor the stated fractional interest of the fraction described in the granting clause.

[¶23] Furthermore, the district court's interpretation of the 1964 warranty deed does not create a "*Duhig* problem" as argued by the Higgins-Devney Appellees. The *Duhig* rule, adopted by this Court in *Kadrmas v. Sauvageau*, 188 N.W.2d 753 (N.D. 1971), derived from a Texas Supreme Court case, *Duhig v. Peavy-Moore Lumber Co.*, 144 S.W.2d 878 (Tex. 1940). A *Duhig* issue arises when a grantor over conveys minerals to a third-party grantee. *Nichols v. Goughnour*, 2012 ND 178, ¶ 15, 820 N.W.2d 740. The following is an example of a *Duhig* issue:

> [W]here a grantor conveys land in such a manner as to include 100% of the minerals, and then reserves to himself 50% of the minerals, the reservation is not operative where the grantor owns only 50% of the minerals. The deed is construed as undertaking the transfer of 50% of the minerals to the grantee. Both this grant and the reservation cannot be given effect, so the grantor loses because the risk of title loss is on him.

*Nichols*, ¶ 15 (quoting *Melchior v. Lystad*, 2010 ND 140, ¶ 8, 786 N.W.2d 8).

[¶24] The district court determined that Milton Higgins reserved an undivided one-half (1/2) interest of all oil, gas, and other minerals not previously conveyed to third parties within the top parcel, yielding him to an undivided 50% of all partnership oil, gas, and other minerals. Milton Higgins and Howard Lund had a "co-equal 50/50 split" of the partnership's mineral interests in the top parcel. Given that the partnership owned an undivided one-half (1/2) of the top parcel's mineral interest at the time the 1964 warranty deed was executed, Milton Higgins' conveyance of the undivided one-half (1/2) interest in the top parcel

while reserving for himself a one-half (1/2) interest in the minerals of that undivided one-half (1/2) interest would mean that Milton Higgins reserved for himself a one-fourth (1/4) interest in the top parcel's minerals. This finding is noted by the court's finding of a "co-equal 50/50 split" of the partnership's minerals between Milton Higgins and Howard Lund, and that Milton Higgins' successors were entitled to "½ of ½" of the top parcel's mineral interests.

[¶25] In addition to concluding the *Duhig* rule does not apply because there is no overconveyance, we conclude there is not a problem with regard to the warranty obligation defeating the reservation. Milton Higgins is not warranting and reserving the same thing at the same time. Rather, Milton Higgins is conveying and warranting the undivided one-half (1/2) interest in the top parcel's surface and a one-fourth (1/4) interest in the top parcel's minerals. He is only reserving a one-fourth (1/4) interest in the top parcel's minerals for himself. We conclude the district court's interpretation of the 1964 warranty deed does not create a *Duhig* problem.

[¶26] We conclude the district court was not clearly erroneous in its interpretation of the 1964 warranty deed. The reservation clause applied to both the top and bottom parcels of the warranty deed. The court's interpretation of the 1964 warranty deed is directly supported by NDMTS § 3-08. The interpretation does not violate the *Duhig* rule. We affirm the court's interpretation of the 1964 warranty deed.

IV

[¶27] The Lund-Eide Appellants argue the district court erred in granting the Higgins-Devney Appellees' motion for summary judgment as the result of an erroneous finding that the parties did not orally stipulate to an interpretation of the 1952 royalty deed during the 2018 trial. The parties agree the alleged stipulation was never reduced into a signed writing.

[¶28] The standard of review governing summary judgment under N.D.R.Civ.P. 56 is well-established:

Summary judgment is a procedural device for the prompt resolution of a controversy on the merits without a trial if there are no genuine issues of material fact or inferences that can reasonably be drawn from undisputed facts, or if the only issues to be resolved are questions of law. A party moving for summary judgment has the burden of showing there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. In determining whether summary judgment was appropriately granted, we must view the evidence in the light most favorable to the party opposing the motion, and that party will be given the benefit of all favorable inferences which can reasonably be drawn from the record. On appeal, this Court decides whether the information available to the district court precluded the existence of a genuine issue of material fact and entitled the moving party to judgment as a matter of law. Whether the district court properly granted summary judgment is a question of law which we review de novo on the entire record.

*Johnson v. Shield*, 2015 ND 200, ¶ 6, 868 N.W.2d 368 (quoting *Hamilton v. Woll*, 2012 ND 238, ¶ 9, 823 N.W.2d 754).

[¶29] Rule 11.3, N.D.R.Ct., governs written and oral stipulations:

No agreement or consent between the parties or their attorneys with respect to proceedings in court is binding, in case of a dispute as to its terms, unless reduced to writing and signed by the parties or their respective attorneys or made in open court and read into the record of the proceedings.

Before a court can determine whether Rule 11.3 applies, it must determine whether the stipulation was "an enforceable agreement between the parties. . . . comply[ing] with the law of contracts." *Tarver v. Tarver*, 2019 ND 189, ¶¶ 7-8, 931 N.W.2d 187. "Courts will not enforce a contract which is vague, indefinite, or uncertain, nor will they make a new contract for the parties." *Id*. ¶ 9 (quoting *Stout v. Fisher Indus., Inc.*, 1999 ND 218, ¶ 11, 603 N.W.2d 52).

[¶30] "An oral contract can be enforced only when the parties have agreed on its essential terms." *Tarver*, 2019 ND 189, ¶ 9. "An agreement which is so uncertain and incomplete as to any of its essential terms that it cannot be carried into effect

without new and additional stipulations between the parties is not enforceable." *Id.* (quoting *Stout*, 1999 ND 218, ¶ 11). "Indefiniteness as to any essential element of the agreement may prevent the creation of an enforceable contract." *Id.* (quoting *Holbach v. Holbach*, 2010 ND 116, ¶ 11, 784 N.W.2d 472). An agreement to later agree, or to discuss the specifics of the essential terms after the fact, is not a binding agreement under the law. *See e.g., Lire, Inc. v. Bob's Pizza Inn Rest., Inc.*, 541 N.W.2d 432, 434 (N.D. 1995).

[¶31] Rule 11.3 further requires the stipulation be "read into the record" when it is not reduced to a signed writing. N.D.R.Ct. 11.3. To ensure that all essential terms of an oral stipulation are understood by the parties, they will only be binding if the parties "dictate all material terms into the record and express their assent to them." 83 C.J.S. *Stipulations* § 21 (2021). Likewise, the record must "affirmatively demonstrate[] that the trial court read the stipulat[ed] terms to the parties and they understood the effects of their agreement." *Id.*; *see Bohlman v. Big River Oil Co.*, 124 N.W.2d 835, 838 (N.D. 1963) (upholding an oral stipulation where its essential terms were dictated in court by the parties, read back to the parties, and asked whether the parties agreed to the read terms). If the above requirements are met, the oral stipulations are generally held to be binding unless there is a showing of fraud, duress, undue influence, or any other grounds for rescinding a contract. *See, e.g., Aaker v. Aaker*, 338 N.W.2d 645, 647 (N.D. 1983); *Kuperus v. Willson*, 2006 ND 12, ¶ 10, 709 N.W.2d 726.

[¶32] An argument that a stipulation is invalid because the court neither "read back" the stipulation nor asked the parties if they agreed to the stipulation should be rejected. *Aaker*, 338 N.W.2d at 646 (A stipulation was enforceable even though "[t]he court, on the record, did not ask the parties if they agreed to the stipulation, nor did the parties, on the record, independently state that they agreed with the stipulation."). There need not be a formal acceptance as long as the parties constructively "accept[ed] the stipulation," which may be evidenced by a party's failure to deny the existence of such an agreement. *Id.* at 647.

[¶33] At the beginning of the 2018 trial, the attorney for the Higgins-Devney Appellees stated on the record the following:

MR. HENNESSY: Item number 1 on that exhibit list is a 1952 nonparticipating royalty interest deed where the operative number there is 8 percent. And we have agreed to a unified interpretation of that royalty deed that involves proportionate reduction as it is applied. And with that, I will defer to other counsel. If they want to explain it more elaborately than I have.

No further elaboration was made. No attempt was made to explain any essential details of the "unified interpretation."

[¶34] Subsequently, the attorney for the Lund-Eide Appellants noted on the record the following:

MR. VAN GRINSVEN: Your Honor, this is Bryan Van Grinsven.

With respect to the exhibits, Mr. Hennessy has correctly described the situation. The only asterisk that I would add is the one we discussed in chambers. With respect to Exhibits 4, 13, and 17, those documents will—would be conditionally admitted. The parties don't agree on the accuracy of the information. They're mostly just notes or summaries prepared by parties or witnesses, so—but, with—subject to that qualification, I believe that all the counsel for the parties have agreed to admission of Exhibits 1 through 17. Is that correct?

MR. HENNESSY: Yes.

MR. VAN GRINSVEN: Okay.

THE COURT: All the parties are shaking their heads?

MS. KRAUS: Yes, Your Honor.

MR. HENNESSY: The answer is yes from Hennessy, Judge.

THE COURT: Okay.

[¶35] Exhibit 13 was an interpretation or calculation of the royalty and mineral acres deeded in the 1952 royalty deed. The Lund-Eide Appellants and Higgins-

Devney Appellees agreed the parties did not agree to the accuracy or the contents of exhibit 13.

[¶36] Bruce Higgins later explained there was mutual understanding of a "unified interpretation," and provided details of the alleged stipulation:

> Q. [MR. HENNESSY] And what can you tell us about your understanding of the 8 percent nonparticipating royalty?
>
> A. My understanding of it is the same what I believe the oil companies came to. Which is that the 8 percent royalty, which is perpetual—in fact, it specifically says, I believe, in that deed that it goes on forever with all future leases. My understanding, is that the 8 percent refers to 8 percent of royalty.
>
> And there are a number of ways in which you can look at that and misinterpret it. I believe my final interpretation is the same one the oil companies came to. Which is that 8 percent royalty, currently under a one-sixth lease, amounts to roughly half of our royalties.
>
> The reason I say that is, most people today are signing a one-sixth royalty interest. One-sixth is 16.67 percent. 8 percent would be almost half of that. Specifically, it would be 48 percent of our current royalties.
>
> Q. And in—is it your understanding that what I'm referring to as the Eide group has stipulated that they understand that 8 percent document the same way you do?
>
> A. That is my understanding.
>
> Q. And that the company—parties in this case have reserved their opinion on what that 8 percent royalty is?
>
> A. I've heard today that the companies are reserving a decision on that. In fact, my analysis of the decimal interest confirmed, at least to me, through Continental at the very least, that—that company has also used the same interpretation of the 1952 royalty deed as I have.
>
> . . . .

Q. [MR. VAN GRINSVEN] Just to put this issue to rest, you've referred to a 1952 royalty deed. Would that be Exhibit No. 1, Mr. Higgins?

A. Yes, it would be.

Q. All right. And my clients have, in fact, stipulated to—we agree with your understanding and interpretation of that deed. And I think that that's best laid out in Exhibit 13. If you could turn to that? At the top of Exhibit 13 you go through, and you've described this a little in your testimony already. But, if a lease is signed that provides for one-sixth royalty, which is 16.667 percent, under the 1952 royalty deed, 8 percent is subtracted from that 16.667 percent?

A. Yes, I based that on a number of things looked into. And the fact is, I think that there was some confusion about what the 1952 [royalty] deed actually meant. But, my final interpretation, as I see it, seems to be the one that oil companies are using. And therefore, it is the figures that I have presented in Exhibit 13.

MR. VAN GRINSVEN: And so, for the record, the Lund/Eide family does stipulate and agree to that interpretation as outlined by Mr. Higgins.

THE COURT: Okay.

[¶37] However, Bruce Higgins later provided an explanation for his earlier testimony, explaining that he was not a party to the 1952 royalty deed, and he merely provided lay opinion that no longer reflects his current opinion.

[¶38] In addition to the questions about whether a complete agreement had been reached, it is generally recognized that stipulations as to the law are invalid and ineffective. 73 Am. Jur. 2d *Stipulations* § 4 (2021). "Trial and appellate courts are not bound by stipulations pertaining to questions of law, or that have the effect of a stipulation on a question of law." 83 C.J.S. *Stipulations* § 28 (2021). Such stipulations will be disregarded. *Id*.

[¶39] The Lund-Eide Appellants also argue that the district court's reliance on the parties' negotiations after the 2018 trial to determine there was no stipulation

16

violates N.D.R.Ev. 408(a). Rule 408(a), N.D.R.Ev., prohibits the use of compromise negotiations to prove or disprove the validity of a disputed claim, is subject to an abuse of discretion standard of review. *Schlossman & Gunkelman, Inc. v. Tallman*, 1999 ND 89, ¶ 26, 593 N.W.2d 374. "A court abuses its discretion if it acts in an arbitrary, unreasonable, or unconscionable manner, or if it misinterprets or misapplies the law." *Jorgenson v. Ratajczak*, 1999 ND 65, ¶ 17, 592 N.W.2d 527. The court did not solely rely on the negotiations when finding there was not a valid stipulation, and the reasoning for its reliance was because if the parties had in fact stipulated at the 2018 trial, there would be no need for the parties to negotiate any further. Such reliance was not arbitrary or unreasonable. We conclude the court did not abuse its discretion by relying on the parties' negotiations to determine there was no stipulation.

[¶40]  The Lund-Eide Appellants also argue that the district court "simply rubber stamped" the proposed findings and order filed by the Higgins Appellees, and did not make any findings of its own. We have previously recognized that a trial court's adoption of proposed findings filed by a party does not, by itself, warrant reversal. *See Smith Enters., Inc. v. In-Touch Phone Cards, Inc.*, 2004 ND 169, ¶ 11, 685 N.W.2d 741 ("Although we prefer that trial courts prepare their own findings of fact, we reject [the appellant's] argument that the court's wholesale adoption of [the appellee's] proposed findings of fact, by itself, is reason to reverse the court's decision.").

[¶41] The district court considered the arguments regarding the asserted stipulation regarding the interpretation of the 1952 royalty deed. We conclude the court did not err in finding that the parties did not stipulate to an interpretation of the 1952 royalty deed.

V

[¶42] The Lund-Eide Appellants argue the district court's division of the suspended oil and gas proceeds is erroneous, in part, because of the erroneous interpretation of the 1952 royalty deed. The court interpreted the 1952 royalty deed to be a floating royalty in granting the Higgins-Devney Appellees' motions for summary judgment.

17

[¶43] The framework for our interpretation of a contract is described in paragraph 13 above and includes a primary goal of ascertaining the intentions of the contracting parties at the time of contracting. We consider the whole of a contract in order to give effect to every part if reasonably practicable. Accordingly, each clause, sentence, and provision of the 1952 royalty deed must be given effect to determine the contracting parties' intent, and to interpret and enforce the contract in its entirety. We also recognize that grants in a contract are interpreted in favor of the grantee with the exception of a reservation within a grant, which we interpreted in favor of the grantor. With that framework, we have noted that if the parties' intent can be ascertained from the writing alone, the interpretation of the contract is entirely a question of law.

[¶44] Whether extrinsic evidence may be used to determine intent depends on whether an agreement is, or is not, ambiguous.

> When the language of a deed is plain and unambiguous and the parties' intentions can be ascertained from the writing alone, extrinsic evidence is inadmissible to alter, vary, explain, or change the deed. If a contract is ambiguous, extrinsic evidence may be considered to clarify the parties' intentions. A contract is ambiguous when rational arguments can be made for different interpretations. Whether a contract is ambiguous is a question of law for the court to decide. On appeal, we independently review a contract to determine if it is ambiguous.

*Nichols*, 2012 ND 178, ¶ 12 (cleaned up).

[¶45] In *Ogren v. Sandaker*, this Court explained a fractional royalty, or a fixed royalty, conveys or reserves a fixed fraction of total production. 2017 ND 105, ¶ 10, 893 N.W.2d 750; *see Hysaw v. Dawkins*, 483 S.W.3d 1, 9 (Tex. 2016); 2-3 Williams & Meyers, *Oil and Gas Law* § 327.1 (2016). A fraction of a royalty, or floating royalty, conveys or reserves a fraction of the total royalty. *Ogren*, ¶ 10.

[¶46] In distinguishing a fixed from a floating royalty, *Ogren* relied on *Hysaw v. Dawkins*. In *Hysaw*, the Supreme Court of Texas held that a floating royalty depends on multiple fractions and occurs when a royalty is tied to something else—such as the royalty provided by an underlying lease referenced in a

18

granting instrument. *Hysaw*, 483 S.W.3d at 9. "[A] fraction of royalty interest (as a percentage of production) varies in accordance with the size of the landowner's royalty in a mineral lease and is calculated by multiplying the fraction in the royalty reservation by the royalty provided in the lease." *Ogren*, 2017 ND 105, ¶ 10 (quoting *Hysaw*, 483 S.W.3d at 9). Other Texas courts have held that language tying a royalty interest to another interest, like the interest in an underlying lease, creates a floating royalty. *See Verde Mins., LLC v. Burlington Res. Oil & Gas Co., LP*, 360 F.Supp.3d 600, 616-17 (S.D. Tex. 2019).

[¶47] Examples of fractional, or fixed, royalties being conveyed include the following:

> "a one-fourth royalty in all oil, gas and other minerals in and under and hereafter produced
>
> "a fee royalty of 1/32 of the oil and gas
>
> "an undivided one-sixteenth royalty interest of any oil, gas or minerals that may hereafter be produced
>
> "one-half of the one-eighth royalty interest
>
> "an undivided 1/24 of all the oil, gas and other minerals produced, saved, and made available for market
>
> > "1% royalty of all the oil and gas produced and saved"

*Ogren*, 2017 ND 105, ¶ 11 (quoting 2-3 Williams & Meyers, *Oil and Gas Law* § 327.1 (2016)). "Standing alone, the effect of this language is to create a fraction or fixed percentage of gross production as a freestanding royalty." *Id*. "The royalty interest owner is entitled to a share of gross production that will not fluctuate according to the amount of royalty provided for in a future lease." *Id*.

[¶48] As this Court explained in *Ogren*, the use of "one-eighth" conveys a floating royalty, rather than a fixed royalty and is the language used in the 1952 royalty deed. The 1952 royalty deed provides that Milton Higgins, Iris Higgins, Howard Lund, and Maude Lund, as grantors, have:

19

[G]ranted, sold, conveyed, assigned and delivered, . . . unto the said grantee *an undivided eight percent interest in and to all of the oil royalty, gas royalty, and royalty* in casinghead gas, gasoline, and royalty in other minerals in and under, and that may be produced and mined from the following described lands situated in the County of Williams . . . .

(Emphasis added.) The grantees are Arnold and Myrtle Lund. This language mirrors the following example of a floating royalty we noted in *Ogren*: "An undivided one-half interest in and to all of the royalty[.]" 2017 ND 105, ¶ 12 (quoting 2-3 Williams & Meyers, *Oil and Gas Law* § 327.2 (2016)).

[¶49] The 1952 royalty deed ties the Lunds' interest to the Higgins' interest in the underlying lease as follows:

Said lands or portions thereof, being now under oil and gas leases executed in favor of Jack Rouse, Casper, Wyoming, & O.V. Hawkins, Mineola, Tex., is understood and agreed that this sale is made subject to the terms of said lease, but covers and includes the same interest as first hereinabove named, of all the oil royalty and gas royalty and casinghead gas and gasoline royalty, and royalty from other minerals or products due and to be paid under the terms of said lease.

[¶50] Another provision of the 1952 royalty deed ties the royalties to another fraction; one-eighth of the eight percent included in the above conveyance paragraph:

Nevertheless, . . . neither the grantor nor the heirs, administrators, executors and assigns of the grantor shall make or enter into any lease or contract for the development of said land or any portion of same for oil, gas or other minerals, unless each and every such lease, contract, leases or contracts shall provide for at least a royalty on oil of the usual one-eight[h] to be delivered free of cost in the pipeline and a royalty on natural gas of one-eighth of the value of same when sold or used off the premises, or one-eighth of the net proceeds of such gas, and one-eight[h] of the net amount of gasoline manufactured from natural or casinghead gas; and in the event the grantor, or the heirs, administrators, executors and assigns of the grantor, or as in the status of the fee owners of the land and

20

minerals, or as the fee owner of any portion of said land, shall operate and develop the minerals therein, grantee herein shall own and be entitled to receive as a free royalty hereunder, an undivided one-eighth of the percent interest first hereinabove named, of all the oil produced and saved from the premises delivered to grantee's credit free of cost in the pipeline, and the same percent interest and portion of the value or proceeds of the sales of natural gas when and while the same is used or sold off the premises, and the same percent interest of the net amount of gasoline or other products manufactured from gas or casinghead gas produced from wells situated on the premises, during the term hereof.

Similar to *Hysaw*, the royalty depends on multiple fractions because it is tied to another interest, which is the underlying lease. Therefore, because the "whole of a contract is to be taken together so as to give effect to every part," the 1952 royalty deed created a floating royalty. *See* N.D.C.C. § 9-07-06.

[¶51] Furthermore, the language of the 1952 royalty deed is unambiguous because "the parties' intentions can be ascertained from the writing alone [which makes] extrinsic evidence . . . inadmissible to alter, vary, explain, or change the deed." *Nichols*, 2012 ND 178, ¶ 12 (quoting *Gawryluk v. Poynter*, 2002 ND 205, ¶ 9, 654 N.W.2d 400).

[¶52] We conclude the 1952 royalty deed clearly and unambiguously conveyed a floating royalty.

VI

[¶53] We conclude the district court did not err in the interpretation of the deeds or in determining a division of the suspended oil and gas proceeds. The judgment of the court is affirmed.

[¶54] Jon J. Jensen, C.J.
Daniel J. Crothers
Lisa Fair McEvers
Jerod E. Tufte
Douglas A. Bahr

21

**Crothers, Justice, specially concurring.**

[¶55] I agree with the majority opinion and have signed it. I write separately because we are forced in Part II of the majority opinion to re-plow familiar ground about whether the court's many purported "judgments" affected appealability of the so-called "final judgment." I again write to cajole district courts to cease entry of what they call "judgments" that are not final disposition of the case, that are not appealable, and that often cause parties unnecessary arguments, proceedings, and delay. *See Morales v. Weatherford U.S., L.P.*, 2024 ND 81, ¶ 41, 6 N.W.3d 657 ("Like in *Dixon [v. Dixon*, 2021 ND 94, 960 N.W.2d 764], I again call on judges and the parties to avoid premature entry of so-called "judgments" so that clients can receive more expeditious and less expensive final resolution of their claims, and the judicial system can be relieved of the burden of proceedings that do little more than consume the clerk of courts' and the judges' time, and delay final resolution of a matter."); *Morales*, ¶ 19 ("The district court misapplied the law when it found the [partial] judgment dismissing Morales's claims against Junewal without prejudice divested it of jurisdiction over the case.").

[¶56]  Daniel J. Crothers